UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
JEAN ROBERT PAUL,               :
                                 :
               Plaintiff,     :

-against-          :

POSTGRADUATE CENTER FOR MENTAL :
HEALTH,                       :

             Defendant.   :
                                 :
-------------------------------------------------------- x

**MEMORANDUM AND ORDER**
12 CV 362 (VMS)

**Scanlon, Vera M., United States Magistrate Judge:**

     Pro se Plaintiff Jean Robert Paul ("Plaintiff") filed this action against Defendant

Postgraduate Center for Mental Health (Defendant").[1]  Docket No. 1.  Plaintiff, who is of Haitian

descent and was 53 years of age when Defendant hired him in March 2009, alleges that

Defendant harassed him and discriminated against him on the basis of his national origin and his

age, and that in so doing, Defendant violated his rights under federal law, namely Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in

---

[1] Plaintiff has been pro se during most of the pendency of this action.  He wrote the Complaint himself, and on January 23, 2012, he filed this action with a motion for leave to proceed in forma pauperis, which was denied by the District Judge then presiding over the case (the Parties later consented to my jurisdiction).  Docket Nos. 1, 2, 3, 33.  Later, on June 28, 2013, Plaintiff filed a motion to have the Court request that an attorney volunteer to take Plaintiff's case pro bono, Docket No. 23, but before the Court could rule on the motion, Plaintiff mooted the issue by announcing that he had experienced a positive change in his financial situation and retained an attorney, who appeared at a telephone conference to discuss his impending representation of Plaintiff, Docket No. 26; Docket Entry 8/8/2013 (terminating the motion as moot).  On November 15, 2013, Plaintiff's counsel, who had not yet entered a Notice of Appearance, represented to the Court that he would not be representing Plaintiff after all.  Docket No. 30. Plaintiff did not renew his motion for pro bono counsel, stating his intention to litigate the action through discovery and summary judgment himself.  Docket No. 29.

Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. Id.[2]  Plaintiff also alleges that Defendant retaliated against him for complaining about that harassment and discrimination, again in violation of Title VII and the ADEA.  Id.

Before this Court is Defendant's motion for summary judgment.  Docket Nos. 39-43. Plaintiff opposes,[3] Docket Nos. 36, 44,[4] and Defendant replies, Docket Nos. 45-46.  For the reasons discussed below, I **grant** Defendant's motion, and the Clerk of the Court is ordered to enter judgment for the Defendant and close this case.[5]

---

[2] For the purposes of this motion only, Defendant assumes that Plaintiff's national origin and age are as he represents.  Docket No. 42.  I will do the same.

[3] Plaintiff's opposition did not comply with the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York because it did not respond to Defendant's Rule 56.1 Statement of Facts with a "correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party," with each statement "followed by citation to evidence which would be admissible."  See Local Civil Rule 56.1(b), (d).  Instead, Plaintiff's opposition is a letter to the Court with no citations to record evidence.

[4] Plaintiff filed his response in opposition to Defendant's summary judgment motion in two places on the docket.  Docket Nos. 36, 44.  That is because Plaintiff originally filed it on the docket as a stand-alone document, Docket No. 36, and then it was filed again as part of Defendant's bundled motion, Docket No. 44.  Going forward, I will cite only to Docket No. 44.

[5] "Because it is not obvious to a lay[person] that a motion for summary judgment supported by affidavits requires a response supported by similar affidavits in order to preserve factual disputes for trial, [the Second Circuit has] held that the failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal."  Sawyer v. Am. Fed. of Gov't Emp., AFL-CIO, 180 F.3d 131, 135 (2d Cir. 1999).
      As detailed in Section I.b., infra, I held several conferences during which I informed Plaintiff about the litigation process and summary judgment proceedings.  I am satisfied that he understands his burden of proof in order to survive a summary judgment motion.
      In addition, the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York require that information be provided to a pro se litigant facing summary judgment proceedings, stating that

> [a]ny represented party moving for summary judgment against a
> party proceeding pro se shall serve and file as a separate document,
> together with the papers in support of the motion, [a] "Notice To
> Pro Se Litigant Who Opposes A Motion For Summary Judgment"

## I.  Background

### a.  Underlying Facts

The following factual summary is compiled principally using Defendant's Rule 56.1

Statement of Facts and supporting exhibits, as Plaintiff failed to submit a responsive Rule 56.1

Statement and exhibits of his own.  Docket No. 43.[6]  Instead, Plaintiff has only submitted

unsworn letters.  Docket Nos. 31, 33, 44; see Russo v. N.Y. Presbyterian Hosp., 972 F. Supp.2d

429, 441 n.12 (E.D.N.Y. 2013) (disregarding three notarized but unsworn letters as evidence on

summary judgment, and listing cases).  Thus, Plaintiff has admitted these facts.  Local Civil Rule

56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement

required to be served by the moving party will be deemed to be admitted for purposes of the

motion unless specifically controverted by a correspondingly numbered paragraph in the

statement required to be served by the opposing party."); Sutton v. City of Yonkers, No. 13 Civ.

801 (GBD) (GWG), 2015 WL 876459, at *1 (S.D.N.Y. Mar. 2, 2015) ("[T]he non-moving

party's burden on summary judgment applies to pro se plaintiffs, notwithstanding the liberal

construction of a pro se plaintiff's pleadings and the deference accorded to the non-moving party

on summary judgment.").  In recognition of Plaintiff's pro se status, I will from time to time cite

to Plaintiff's Complaint and two letters he has submitted to the Court to identify places in which

Plaintiff's allegations go beyond the existing record.  Docket No. 1 (Plaintiff's Complaint);

---

with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1
attached.  Where the pro se party is not the plaintiff, the movant
shall amend the form notice as necessary to reflect that fact.

Civil Local Rule 56.2.  Here, Defendant has filed proof of its compliance with Local Civil Rule
56.2.  Docket No. 40.

[6] Defendant's counsel Michael Abitabilo submitted an affidavit to the Court testifying to the fact
that the exhibits Defendant has submitted in support of its summary judgment motion are true
and correct copies.  Docket No. 41, passim.

Docket No. 31 (Plaintiff's summary letter to the Court); Docket No. 44 (Plaintiff's response in opposition to Defendant's summary judgment motion).

### i.  Introductory Synopsis Of The Action And This Motion

Defendant has employed Plaintiff as a case manager at a residential facility for adults needing a variety of social and health services.[7]  Plaintiff and two other case managers tended to their clients out of a small shared office at that residential facility.  Unfortunately, Plaintiff and his fellow case managers did not get along well and fought often.  This action deals with those disagreements and related incidents.  The most alarming of these alleged incidents was an alleged attempted shooting that Plaintiff may have experienced while on his lunch hour near the office.  Other incidents involved more workaday matters such as Plaintiff's co-worker making personal telephone calls in the office and counseling one of Plaintiff's clients when she should have referred the matter to Plaintiff.  There is also an allegation that Plaintiff's colleagues stated he could not advance in the office due to his national origin and age.

It is Plaintiff's position that these incidents together represent his co-workers' unlawful harassment of him and discrimination against him on the basis of his national origin and age. Plaintiff imputes the unlawful harassment and discrimination to Defendant because Plaintiff believes that management assigned partial blame to Plaintiff for office tension which, according to Plaintiff, emboldened his co-workers to harass and discriminate against him further.  Finally, Plaintiff argues that Defendant retaliated against him for his harassment and discrimination complaints against his co-workers.

It is Defendant's position that Plaintiff's problems with his co-workers were nothing more than personality conflicts and that management addressed Plaintiff's complaints promptly

---

[7] Although I have thoroughly cited to the record in the expanded factual statement, this synopsis does not include those citations for the sake of brevity.

and appropriately.

### ii. The Nature Of Defendant's Business And Plaintiff's Employment And Work Responsibilities

Defendant is a non-profit organization that provides mental health and residential services to individuals in need in four of the five New York City boroughs.  Docket No. 43 ¶ 1; Docket No. 41-3 ¶ 4.  Among the services provided are supportive case management services, the purpose of which is to assist the Defendant's clients in reaching various social, physical and/or mental-health goals.  Docket No. 43 ¶ 2; Docket No. 41-3 ¶ 5.  Defendant has a written EEO Harassment and Sexual Harassment policy ("the EEO policy") in which its employees are encouraged to bring any complaints or grievances regarding unlawful discrimination directly to their supervisor or management.  Docket No. 43 ¶ 3; Docket No. 41-3 ¶ 9; Docket No. 41-4.  In brief, the EEO policy explains: (1) that Defendant's policy is to "recruit, hire, train and promote" and to ensure that "all personnel actions such as compensation, benefits, transfers, layoffs, [Defendant]-sponsored training, education, tuition assistance, and recruiting programs" are administered without regard to employees' or applicants' "sex, disability, race, religion, color, creed, national origin, age, marital status, sexual orientation or affectional preference, veteran status or citizenship status."  Docket No. 41-4.  The EEO policy then outlines a grievance and complaint procedure for an employee to follow in making a complaint about an allegedly discriminatory or harassing incident with his or her supervisor, including the protocol for additional complaint when a supervisor, or even that supervisor's supervisor, responds in a manner which is unsatisfactory to the complainant.  Id.

In or around March 2009, Defendant's Vice President of Operations Marcia Holman ("VPO Holman") and Case Management Program Coordinator Lanre Yoosuf ("Supervisor Yoosuf") interviewed Plaintiff for a job at Defendant's Seaview Manor Supportive Case

Management Program ("Seaview") at an adult residential facility in Far Rockaway, New York. Docket No. 43 ¶ 6; Docket No. 41-3 ¶ 11. VPO Holman and Supervisor Yoosuf jointly decided to hire Plaintiff; they knew his age and that he was Haitian when they hired him. Docket No. 41-3 ¶ 12; Docket No. 47-1 at 96-97, 269-70. At the time, VPO Holman was approximately 58 years old. Docket No. 41-3 ¶ 1. Supervisor Yoosuf's age is not in the record.

On March 23, 2009, Plaintiff began working for Defendant as a supportive case manager ("SCM") at Seaview and, at or around that time, Plaintiff received a copy of Defendant's EEO policy. Docket No. 43 ¶¶ 4, 9; Docket No. 41-3 ¶ 10; Docket No. 41-5. Plaintiff continues to work at Seaview in this capacity. Docket No. 43 ¶ 5; Docket No. 41-3 ¶ 13.

At all relevant times, Plaintiff's responsibilities as an SCM at Seaview include, but are not limited to, individually managing the needs of a case load of clients; documenting and recording all services provided to clients; ensuring timely submission of all documentation and recording of services provided to clients in order to keep client charts current; making an adequate number of client visits in order to meet team goals; participating in staff meetings and case conferences, both at Seaview and at other treatment facilities as needed; and providing coverage for other SCM clients when necessary. Docket No. 43 ¶ 10; Docket No. 41-3 ¶ 17.

### iii. Plaintiff's Supervisors, Co-workers And Work Space

Supervisor Yoosuf was Plaintiff's supervisor from March 2009 until in or around April 2011, at which time Kathy Momperousse replaced her ("Supervisor Momperousse"). Docket No. 43 ¶¶ 7-8; Docket No. 41-3 ¶ 14. From then until the present day, Supervisor Momperousse has been Plaintiff's supervisor. Docket No. 41-3 ¶ 15. Supervisor Momperousse is of Haitian descent. Docket No. 41-3 ¶ 16. Plaintiff testified that Supervisor Momperousse's parents were born in Haiti and that although Supervisor Momperousse herself was not, "if you speak with her .

. . in Creole, you can say [that] she was born in Haiti. . . . She speaks . . . fluently and with a correct accent." <u>Docket No. 47-1</u> at 271.

Beginning in January 2011 and for all relevant periods after that, Case Management Director Peter Wefers ("CM Director Wefers") also worked at Seaview. <u>Docket No. 43</u> ¶ 27. CM Director Wefers was stationed at Seaview in part to help as Supervisor Yoosuf transitioned out of her post and Supervisor Momperousse transitioned in. <u>Docket No. 43</u> ¶ 27; <u>Docket No. 41-3</u> ¶ 29. As a result, CM Director Wefers himself directly supervised Plaintiff for a time. <u>Docket No. 41-3</u> ¶ 29.

At all times relevant to this litigation, Plaintiff has worked out of a small rectangular office on the first floor of a residential care facility unaffiliated with Defendant. <u>Docket No. 43</u> ¶ 11; <u>Docket No. 41-3</u> ¶ 18. At all times relevant to this matter, Plaintiff has shared workspace with four people: (1) Supervisor Momperousse; (2) SCM Nicole Hibbert; (3) SCM Errol Miller; and (4) SCM Gisele Nelson.[8] <u>Docket No. 43</u> ¶ 12; <u>Docket No. 41-3</u> ¶ 19; <u>Docket No. 41-12</u> (Plaintiff discussing his problems with Ms. Hibbert and Mr. Miller in the shared office); <u>Docket No. 41-17</u> (Supervisor Mompoerousse discussing Plaintiff's problems in the shared office with Ms. Hibbert and Mr. Miller); <u>Docket No. 41-18</u> (same); <u>Docket No. 31</u>.

In or around November 2011, Ms. Hibbert was transferred to a different location, and SCM Giselle Nelson began working in the Far Rockaway location with Plaintiff. <u>Docket No. 43</u> ¶ 14.

---

[8] Plaintiff's testimony also mentioned that a man named Josh worked in the office for a short time but had little information about him. <u>Docket No. 47-1</u> at 146-47. As Josh plays no role in the disputes that give rise to this action, I will not discuss him further in this Memorandum and Order.

### iv. The Alleged Harassment, Discrimination And Retaliation

#### 1. Plaintiff's Initial Disputes With Ms. Hibbert And Mr. Miller

Plaintiff claims that his workplace problems with Ms. Hibbert and Mr. Miller began in or around September 20, 2010, when he complained that Ms. Hibbert and Mr. Miller told him that he was "old, Haitian and [that he] can't be [a] boss" in the office, and that they excluded him from a daytime boat excursion with clients because they said that the "trip is for young people."[9] Docket No. 41-12; Docket No. 43 ¶ 34; Docket No. 47-1 at 208.[10] According to Plaintiff, he submitted a complaint to VPO Holman about this incident through a telephone call or an email. Docket No. 47-1 at 209. On or around October 4, 2010, VPO Holman held a meeting with Plaintiff, Ms. Hibbert and Mr. Miller to discuss the incident and counseled them on "working together for the benefit of the clients." Docket No. 43 ¶ 35; Docket No. 47-1 at 209.[11]

Plaintiff's opinion of VPO Holman's intervention in later years varied. On July 7, 2011, Plaintiff wrote on a Human Resources document that the meeting provided no solution, Docket

---

[9] On February 28, 2014, Plaintiff filed a letter with the Court alleging that on February 25, 2014, Mr. Miller "blocks my seat for a while to throw slurs to me. He said they can send him to the psych ward." Docket No. 31 at 5. Plaintiff further alleged that Supervisor Momperousse watched the entire episode. Id. There is no evidence in the record stating what those slurs were or providing any other detail about the event. As a result, I will not discuss this allegation further in this Memorandum and Order because there is no triable issue of fact relevant to Plaintiff's Title VII and ADEA claims.

[10] Plaintiff expresses some confusion as to when the excursion exclusion occurred and says that it may have been during the summer of 2010 or in September 2010. Docket No. 47-1 at 214. For the purposes of this motion I will assume that the excursion exclusion happened in September 2010, at the same time as the "old Haitian" insult as the earlier date would, in any event, be immaterial to my analysis.

[11] Plaintiff lists the date of the meeting as October 4, 2011, but insofar as he wrote his statement on July 7, 2011, that is impossible. Docket No. 41-14. It is possible that the meeting took place on October 4, 2009, but as the timeline of the insult and complaint supports a reasonable inference that Plaintiff meant October 4, 2010, I will assume that that date is the correct one. In any event, even if the meeting did occur on October 4, 2009, it would not change my analysis.

No. 41-12, and Plaintiff testified that he felt isolation at work in the period after the September 2010 incident, Docket No. 47-1 at 53.[12]  Plaintiff also testified at the same deposition that VPO Holman had "responded positively" to Plaintiff's September 2010 complaint about his co-workers and that Plaintiff was satisfied with VPO Holman's response at the October 4, 2010 meeting.  Docket No. 43 ¶ 35; Docket No. 47-1 at 210.

## 2. The June 15, 2011 And June 16, 2011 Incidents

On June 16, 2011, Plaintiff complained to CM Director Wefers and Supervisor Momperousse about a series of events that had allegedly transpired between him and Ms. Hibbert on June 15 and June 16, 2011.[13]  Docket No. 43 ¶ 36.  On June 16, 2011, Supervisor Momperousse e-mailed CM Director Wefers and the then-Assistant Vice President of Case Management Mary McGovern ("CMVP McGovern") to describe Plaintiff's complaint:[14]

> On June 15th, [Plaintiff] stated that he used [Ms. Hibbert's] office phone and [Ms. Hibbert] told him not to use her phone.  [Plaintiff] states that [Ms. Hibbert] wiped off the phone with disinfecting products.  She also pushed the computer against [Plaintiff's] leg.

---

[12] In this same Human Resources document, Plaintiff stated that he complained to HR Director Tolle, and not VPO Holman, about the September 2010 remarks.  Docket No. 41-12.  Plaintiff's contradictory statements in this regard are not material to my analysis.

[13] Plaintiff's Complaint alleges that he complained to CM Director Wefers as well and that CM Director Wefers's response was to suggest that Plaintiff "quit the job" and/or to report the incidents to Defendant's Human Resources Department.  Docket No. 1.  Plaintiff has also told the Court in his February 28, 2014 letter that CM Director Wefers knew that Ms. Hibbert "acted like an envoy in a mission to destroy [him] the best way she knew how," which tends to prove that Defendant did nothing to address the situation.  Docket No. 31 at 2.  Plaintiff indicated that he would subpoena CM Director Wefers if necessary to obtain his testimony to support this theory.  Id.  Plaintiff does not appear to have obtained CM Director Wefers's deposition testimony on this issue because the record contains no such evidence.

[14] It should be noted that although Supervisor Mompourousse was not Plaintiff's supervisor at the time of the September 2010 "old Haitian" insult and the excursion exclusion, which allege the most overt mention of Plaintiff's national origin and age in this action, Plaintiff testified that Supervisor Momperousse was aware that the September 2010 incidents had occurred because he told her about them.  Docket No. 47-1 at 270.

> In the afternoon [Ms. Hibbert's] father stopped by the office, he said hello and [Plaintiff] waved back. [Plaintiff] stated that [Ms. Hibbert] told him "don't speak to my f***ing family." [Plaintiff] stated that [Ms. Hibbert] told him ["]no one likes you here and we can shoot you out of here.["]
>
> On June 16th [Plaintiff] went out for lunch. He states that while he was standing at the bus stop near Beach 47th Street a group of bandits was walking towards him with their hands in their pockets. [Plaintiff] stated he then took out his cell phone and they ran away. He then heard gun shots. According to [Plaintiff] this occurred near [Ms. Hibbert's] sister's house.

Docket No. 41-9. Supervisor Momperousse's June 16, 2011 email did not mention that Plaintiff alleged discrimination of any kind. Id.

According to Plaintiff, CM Director Wefers's response to Plaintiff's complaint was to ask him why he didn't quit and also to instruct him to report the incident to Human Resources. Docket No. 47-1 at 272, Docket No. 1. Plaintiff testified that he told CM Director that he would not "quit my job for this discrimination, I believe Human Resources managers can train the harasser to be a better person, [perhaps they will] not [be able to] change her, but change her behavior." Docket No. 47-1 at 272. Plaintiff also testified that he could not recall whether Ms. Hibbert said anything to him on June 15 or June 16, 2011 about his national origin or age. Id. at 224-25.

### 3. Defendant Investigated The June 15, 2011 And June 16, 2011 Incidents, Resulting in HR Director Tolle's June 17, 2011 Summary Report

Supervisor Momperousse's email triggered an immediate investigation by Defendant into the alleged June 15, 2011 and June 16, 2011 incidents. Docket No. 43 ¶ 38; Docket No. 41-3 ¶ 32. On June 17, 2011, Defendant's Human Resources Director Stephanie Tolle ("HR Director Tolle") met with Plaintiff and Ms. Hibbert separately to discuss the matter and wrote a summary report. Docket No. 41-10; Docket No. 41-3 ¶ 33. In HR Director Tolle's June 17, 2011

Summary Report, the only mention of discrimination comes from Ms. Hibbert, who commented that Plaintiff "believes she is . . . racist against Haitians" and "repeatedly brings up racism." Docket No. 41-10. HR Director Tolle's June 17, 2011 Summary Report's description of Plaintiff's statements is devoid of national origin or age discrimination allegations. Id.

### (1) The September 2010 Beginning Of Plaintiff And Ms. Hibbert's Conflict And Its General Nature

According to HR Director Tolle's June 17, 2011 Summary Report, Ms. Hibbert said that her conflict with Plaintiff began in September 2010, when they had a falling out over a trip that they were both scheduled to take with clients. Id. On the day of the trip in question, Plaintiff called out sick, leaving Ms. Hibbert with very little help. Id. Generally speaking, Ms. Hibbert believed that Plaintiff did not help his co-workers. Id. According to Ms. Hibbert, Plaintiff believed that Ms. Hibbert thought that she was his boss, and he often accused her of being "racist against Haitians." Id.

As a result of the "constant tension" between her and Plaintiff, Ms. Hibbert reported that her morale suffered and that she felt uncomfortable in the office. Id. She did not believe that they could continue to work together, but she did not want to resign or be transferred because she felt she had built relationships with her clients at Seaview. Id.

According to HR Director Tolle's June 17, 2011 Summary Report, Plaintiff stated that things were tense between him and Ms. Hibbert from the very first day they worked together. Docket No. 41-10. Plaintiff said that that tension manifested in part in Ms. Hibbert being a bully who called him a "nobody" and who "pushed equipment against his leg." Id. Plaintiff theorized that the bad blood between them started because Ms. Hibbert resented the fact that Plaintiff got to sit at a desk intended for a supervisor, while Ms. Hibbert sat at a desk for an SCM. Id. As a result of their difficult relationship, Plaintiff chose to communicate with Ms. Hibbert through

notes that he placed on her computer.  Id.

### (2) The Telephone Issues

According to HR Director Tolle's June 17, 2011 Summary Report, Plaintiff and Ms. Hibbert both confirmed that there were frequent disputes between them relating to the office telephone on Ms. Hibbert's desk.  Id.  Plaintiff accused Ms. Hibbert of disinfecting the telephone after Plaintiff used it, and Ms. Hibbert freely admitted that she used sanitizer on the telephone. Id.

Plaintiff complained that Ms. Hibbert would tell him not to use her telephone, which was unfair because Ms. Hibbert would sometimes use his computer.  Id.  Ms. Hibbert wished that Plaintiff would get his own telephone at work because Plaintiff screened incoming calls to see if any of them involved Ms. Hibbert's personal business and, if they did, he did not put them through to her.  Id.

In addition, Ms. Hibbert explained that the telephone is a point of dispute in the office because Plaintiff and Ms. Hibbert gave clients contradictory information as to whether clients may use it.  Id.

### (3) Ms. Hibbert's June 15, 2011 Demand That Plaintiff Not Speak To Her Family

According to HR Director Tolle's June 17, 2011 Summary Report, Ms. Hibbert admitted that on June 15, 2011, she told Plaintiff not to speak to her family.  Id.  According to Ms. Hibbert, she did this in response to Plaintiff's remark to her visiting father that Ms. Hibbert was in a "bad mood."  Id.

### (4) The Alleged June 15, 2011 Threat

According to HR Director Tolle's June 17, 2011 Summary Report, Plaintiff said that Ms. Hibbert told him, shortly after Ms. Hibbert told him not to speak to her father, that "[w]e will

shoot you out of here."[15]  Id.  Plaintiff alluded to other threats but, according to HR Director

Tolle's notes, he could not explain what those threats were.  Id.

### (5) The Alleged June 16, 2011 Attempted Shooting

According to HR Director Tolle's June 17, 2011 Summary Report, Plaintiff recounted

that, while outside on his lunch break on June 16, 2011, he was near a bus stop near Ms.

Hibbert's sister's ("Denise Hibbert") home when a group of young men approached him.  Id.

The youths then ran away when Plaintiff pulled out his cellular telephone.  Id.  When Plaintiff

turned and walked the other way, he heard two gun shots.  Id.  Plaintiff flagged down the police.

Id.  In addition to Supervisor Momperousse, Plaintiff reported the incident to CM Director

Wefers.  Id.

Ms. Hibbert denied making any threats against Plaintiff on June 16, 2011, or at any other

time.  Id.

### 4. Plaintiff And Ms. Hibbert Were Both Disciplined For Unprofessional Behavior

HR Director Tolle's June 17, 2011 Summary Report did not make any conclusions about

what, if anything, had happened to Plaintiff when he was out of the office during the alleged

June 16, 2011 attempted shooting.  Id.; Docket No. 41-3 ¶ 34; Docket No 47-1 at 207-09.  After

her interviews with Plaintiff and Ms. Hibbert, HR Director Tolle took steps to initiate discipline

with respect to aspects of Plaintiff and Ms. Hibbert's dispute.  HR Director Tolle met with

Defendant's Chief Executive Officer Jacob Barak ("CEO Barak") to discuss the employees'

interpersonal conflict and to develop a plan of action ("the Plan").  Docket No. 43 ¶ 42; Docket

No. 41-3 ¶ 36.  On June 29, 2011, HR Director Tolle emailed the Plan to CMVP McGovern, CM

---

[15] Plaintiff testified that he asked Ms. Hibbert "What did you mean by that?", but that Ms. Hibbert by that point was so furious he did not press the matter.  Docket No. 47-1 at 220.

Director Wefers and Supervisor Momperousse, with a copy to VPO Holman. Docket No. 41-11.

The Plan was to give both Plaintiff and Ms. Hibbert a disciplinary write up (Defendant's internal term for this is a "Performance Correction Notice") for failing to work as a team and reminding them that any further incidents would result in additional disciplinary action, including transfer or termination. Id. In addition, the Performance Correction Notice would include "measurements" of how Plaintiff and Ms. Hibbert were expected to work as a team. Id. In the event that Plaintiff and Ms. Hibbert could not resolve their differences and transfer became necessary, the Plan contemplated asking Plaintiff to transfer. Id. In particular, HR Director Tolle asked the recipients of the Plan email to research Plaintiff's travel time from home to Seaview as compared to the travel time from Plaintiff's home and another Defendant work location called Garden of Eden ("GOE") in order to determine if a GOE transfer "would mean a hardship to [Plaintiff]." Id.

On July 7, 2011, Plaintiff received his Performance Correction Notice, and on July 12, 2011, Ms. Hibbert received hers. Docket No. 41-12; Docket No. 41-13. Each Performance Correction Notice was identical, stating that:

> On Wednesday June 15, 2011[,] you engaged in a verbal dispute with one of your co-workers, . . . over the use of an agency phone. This altercation was the continuation of various other disputes you have had with [your co-worker]. Despite meeting with management there has been no noticeable improvement in your ability to work professionally with [your co-worker,] and this lack of improvement has impacted negatively on the program and its clients. It also disrupts the continuum of care that [Defendant] is expected to provide.

Docket No. 41-12; Docket No. 41-13. The Performance Correction Notices also provided the following outcomes and consequences:

> Positive: If you are able to respectfully work together as a team you will maintain your employment with [Defendant].

> Negative:  Failure to follow the above plan will result in further
> discipline up to, and including termination of employment.

> Scheduled Review Date:  Weekly for the next 6 months.

<u>Docket No. 41-12</u>; <u>Docket No. 41-13</u>.  Other than the Performance Correction Notice requiring

Plaintiff to meet regularly with management for progress discussions, Plaintiff testified that he

was not suspended or demoted and that his pay was not decreased as a result of the Performance

Correction Notice.  <u>Docket No. 47-1</u> at 195.

The Performance Correction Notices provided an opportunity to Plaintiff and Ms. Hibbert

to state their respective positions about the discipline.  <u>Docket No. 41-12</u>.  Plaintiff hand wrote

more than two pages of comments in which he provided additional detail as to the events of June

15, 2011.  <u>Id.</u>  According to Plaintiff, CM Director Wefers asked Plaintiff what Plaintiff believed

the phrase "[w]e will shoot you out of here" meant, and that Plaintiff responded, "it is open to

many interpretations, including sending . . . gang members to attack me on the street."  <u>Id.</u>

Next, Plaintiff's comments on his Performance Correction Notice appeared to change his

description of the gunfire incident.  <u>Id.</u>  Whereas both Supervisor Momperousse's June 16, 2011

email and HR Director Tolle's June 17, 2011 Summary Report stated that Plaintiff described that

the group of youths had run away from Plaintiff after he pulled out his cellular telephone and

<u>then</u> he heard gun shots, Plaintiff's comments on his Performance Correction Notice stated

instead that when the group of youths "got closer, I pulled [out] my cell phone then they

open[ed] gun fire on me."  <u>Id.</u>

Third, Plaintiff's comments on his Performance Correction Notice mentioned an incident

that occurred in the year 2010 which Plaintiff believed Defendant's management had handled

incorrectly.  <u>Id.</u>  On September 20, 2010, Plaintiff claimed to have reported an incident to

Defendant's Human Resources Department involving Ms. Hibbert and Mr. Miller harassing and being verbally abusive to him.  Id.  "They told me that I am old, Haitian and [that] I can't be [a] boss here."  Id.  These remarks appear to allude to the September 20, 2010 incident and VPO Holman's subsequent intervention.

Finally, Plaintiff's comments on his Performance Correction Notice concluded with the following remark:  "I am always a victim and because of the bias of [Defendant's] management against me, co-workers treat me as [a] nobody as they always sa[y] I am.  I am the victim of hostility because of my age and my national origin [and] I am seeking justice.  I [am] consider[ing] suing [Defendant] for discrimination."  Id.

### 5. Defendant Offered Plaintiff A Transfer To GOE With A Salary Increase, And Plaintiff Declined The Offer

Plaintiff testified that he was not demoted, not suspended and did not receive a salary decrease contemporaneous with the Performance Correction Notice.  Docket No. 47-1 at 195. On July 11, 2011, Plaintiff had a meeting relating to the Performance Correction Notice with CMVP McGovern, in which CMVP McGovern asked Plaintiff if he would be interested in transferring to another SCM position at Defendant's GOE work location.  Docket No. 43 ¶ 45. Supervisor Momperousse was present during this meeting and took notes.  Docket No. 41-14. Supervisor Momperousse's July 11, 2011 Meeting Notes reflect that Plaintiff did not mention national origin or age discrimination during the conversation.  Id.

According to Supervisor Momperousse's July 11, 2011 Meeting Notes, Plaintiff said that the transfer would be "like a demotion" if it were only for an SCM position.  Id.  Plaintiff indicated that his travel time to and from GOE would be similar to his travel time to and from Seaview, but he also stated that he would not transfer to GOE for a SCM position.  Id.  Plaintiff told CMVP McGovern that he would "only accept a promotion with an increase in pay."  Id.

According to Supervisor Momperousse's July 11, 2011 Meeting Notes, in response to Plaintiff's statement that he would only consider a transfer if he also received a promotion and a raise, CMVP McGovern stated that she might have an Intensive Case Management Position ("ICM") position available.  Id.  Plaintiff responded that he would "accept an ICM position."  Id.

CMVP McGovern said that she would seek official approval so that Plaintiff could move forward to an interview for an ICM position at GOE, although she reminded him that any new agency position involved a six-month period of probation, with a three-month and six-month review.  Docket No. 41-3 ¶ 36; Docket No. 41-14.  Defendant has a written policy stating that "[a]ll promoted employees are required to serve a six (6) month probationary period in their new position."  Docket No. 41-15; Docket No. 41-3 ¶ 39.[16]

Finally, according to Supervisor Momperousse's July 11, 2011 Meeting Notes, Plaintiff protested that if he were to be placed on probationary status, it would make it easier for Defendant to fire him.  Docket No. 41-14.  As a result of this concern, Plaintiff declined CMVP McGovern's offer to begin exploring the ICM promotion opportunity.  Docket No. 43 ¶ 49; Docket No. 41-3 ¶ 38.

**6.  Plaintiff And Ms. Hibbert's August 12, 2011 Dispute Regarding A Telephone Call From Ms. Hibbert's Sister And Ms. Hibbert Answering A Question Posed By The Sister Of One Of Plaintiff's Clients**

On August 12, 2011, Plaintiff complained to Supervisor Momperousse that Ms. Hibbert had begun her "BS" again.  Docket No. 41-16.  For example, Plaintiff was offended that Ms. Hibbert continued to sanitize the phone.  Docket No. 43 ¶ 50.  Supervisor Momperousse opened

---

[16] Defendant's written promotion policy also states that "[t]o be eligible for a promotion, an employee must have a discipline-free work record for the previous six (6) months."  Docket No. 41-15.

an investigation.  <u>Docket No. 41-16</u>.  Supervisor Momperousse took notes to create a record of her interviews with Plaintiff and Ms. Hibbert about the dispute.  <u>Id.</u>  According to Supervisor Momperousse's August 12, 2011 Investigation Notes, Plaintiff said nothing during the interview about national origin or age discrimination specifically, although he did at one point say that he was going to call a lawyer and also that Defendant "is going to have to pay."  <u>Id.</u>

### (1) Ms. Hibbert's Request That Plaintiff Pass Her A Telephone Call From Her Sister

According to Supervisor Momperousse's August 12, 2011 Investigation Notes, Plaintiff said that the August 12, 2011 incident began when Ms. Hibbert "ordered" him to give her the telephone if her sister called.  <u>Docket No. 41-3</u> ¶ 40; <u>Docket No. 41-16</u>.  Plaintiff asked Ms. Hibbert if that was "a command or an order," and Ms. Hibbert responded that she did not want to discuss it further.  <u>Id.</u>

According to Supervisor Momperousse's August 12, 2011 Investigation Notes, Ms. Hibbert explained that her sister was in the late stages of a pregnancy, and Ms. Hibbert did not have her cellular telephone with her on the day in question, which is why she asked Plaintiff to pass her any telephone call from her sister.  <u>Id.</u>  Ms. Hibbert confirmed that she told Plaintiff that she did not want to discuss the matter further when Plaintiff asked whether Ms. Hibbert was giving him an order.  <u>Id.</u>

After considering both Plaintiff's and Ms. Hibbert's version of events about the telephone, Supervisor Momperousse's August 12, 2011 Investigation Notes concluded that, as no one else was in the office at the time the conversation took place, "it is unknown what the tone of the conversation was."  <u>Id.</u>

### (2) Ms. Hibbert's Meeting With The Sister Of One Of Plaintiff's Clients

Next, according to Supervisor Momperousse's August 12, 2011 Investigation Notes, Plaintiff complained that Ms. Hibbert answered a question for the sister of one of Plaintiff's clients regarding transportation of the client for a home visit. Id.; Docket No. 41-3 ¶ 40. Plaintiff was upset that Ms. Hibbert had not referred the matter to him. Docket No. 41-16.

Plaintiff explained that the client's sister asked for Ms. Hibbert by name, and Supervisor Momperousse asked why Plaintiff had not simply interjected in order to handle the inquiry himself. Id. Plaintiff responded that if the shoe had been on the other foot, Defendant would take Plaintiff to task and say: "How dare you handle something for a client when the [assigned SCM] was here." Id.

According to Supervisor Momperousse's August 12, 2011 Investigation Notes, Ms. Hibbert said that when the client's sister appeared at the office and asked for Ms. Hibbert by name, she "did not know how she knew my name." Id. Ms. Hibbert "thought [that] maybe the client felt more comfortable with me so she told her sister to speak to [me, but I] told her that in the future she should [discuss] any client situation [with] the assigned [SCM] unless it's an emergency and the [SCM] is not available." Id.

Supervisor Momperousse's August 12, 2011 Investigation Notes concluded that Plaintiff felt undermined by Ms. Hibbert's handling of Plaintiff's client's issue. Id. Supervisor Momperousse told Plaintiff that going forward, the office required a client's assigned SCM to handle any issues relating to that client when the assigned SCM was available, and she instructed Ms. Hibbert of the same. Id. Finally, Supervisor Momperousse said that "[m]oving forward," "all staff must address any issues they have directly with [her]," rather than attempting to handle the issues themselves first. Id.

**7. Plaintiff And Ms. Hibbert's October 12, 2011 Dispute Regarding Who Should Have Moved Ms. Hibbert's Purse From The Paper Shredder So That Plaintiff Could Use It**

On October 12, 2011, Plaintiff and Ms. Hibbert had yet another argument. This time, Plaintiff wanted to use the office paper shredder, but he found that Ms. Hibbert's personal bag was on top of it. Docket No. 41-17; Docket No. 41-3 ¶ 40. Plaintiff attempted to pick up Ms. Hibbert's bag with a stapler to move it so that he could use the shredder. Docket No. 41-17. The dispute came to the attention of Supervisor Momperousse, who sent an email summary of the incident to CMVP McGovern and CM Director Wefers. Id.

According to Supervisor Momperousse's October 12, 2011 Email Summary Report, Ms. Hibbert told Plaintiff that if he asked her to move the bag, she would. Id. Plaintiff then told Ms. Hibbert to move the bag "now," and Ms. Hibbert refused. Id. At that point, Mr. Miller intervened, picked up the bag and moved it. Id. Supervisor Momperousse's October 12, 2011 Email Summary Report makes no mention that Plaintiff made any allegation of national origin or age discrimination regarding the paper-shredder event.

**8. Plaintiff's November 9, 2011 Hole-Punch Litter Dispute With Ms. Hibbert And Mr. Miller**

On November 9, 2011, Plaintiff arrived at work to find little paper circles from a hole puncher on his desk and chair. Docket No. 41-18. Plaintiff confronted Ms. Hibbert and Mr. Miller and asked them whether they were responsible. Id.; Docket No. 41-3 ¶ 40. Supervisor Momperousse began another investigation. Docket no. 41-18.

According to Supervisor Momperousse's November 9, 2011 Email Summary Report, Plaintiff said that Ms. Hibbert and Mr. Miller both denied involvement, and that Mr. Miller told the Plaintiff that "[n]o one likes you here, not one person at Seaview likes you." Id. Plaintiff told Supervisor Momperousse that Mr. Miller said that no one liked Plaintiff at his previous job,

either.  Id.

In his conversation with Supervisor Momperousse, Plaintiff compared his plight at Seaview to the religious persecution suffered by Jewish people in Hitler-era Germany and in modern-day Iran, although Supervisor Momperousse's November 9, 2011 Email Summary Report makes no mention of Plaintiff stating anything specifically about himself being a victim of national origin or age discrimination.  Id.  Plaintiff took pictures of his desk as the first step in an investigation that Plaintiff himself intended to conduct.  Id.  Plaintiff then left the paper circles on his desk and chair all day because, according to Plaintiff, the person who put them there was responsible for cleaning the paper up.  Id.

Plaintiff told Supervisor Momperousse that Mr. Miller approached him later and apologized for his earlier outburst.  Id.  Mr. Miller said that he would clean up the paper circles as a peace offering, but Plaintiff complained to Supervisor Momperousse that in the end Mr. Miller cleaned Plaintiff's chair but not his desk.  Id.

According to Supervisor Momperousse's November 9, 2011 Email Summary Report, when Supervisor Momperousse asked Mr. Miller and Ms. Hibbert for their versions of the story, Mr. Miller denied saying that no one at Seaview liked Plaintiff.  Id.  As for the paper circles, Mr. Miller stated that he told Plaintiff that it was conceivable that Mr. Miller or another employee had done it accidentally, an explanation that Plaintiff refused to accept.  Id.  Mr. Miller also remembered Plaintiff stating something about Hitler and the Jewish people, but he did not remember exactly what Plaintiff said.  Id.

Supervisor Momperousse's November 9, 2011 Email Summary Report concluded by noting that Supervisor Momperousse cleaned up the paper circles herself, and Plaintiff stated that his personal investigation was closed because Mr. Miller had apologized.  Id.

### 9. Plaintiff's November 14, 2011 Meeting With CMVP McGovern

On November 14, 2011, in the aftermath of the hole-punch incident, CMVP McGovern met with Plaintiff. Docket No. 43 ¶ 57; Docket No. 41-3 ¶ 41. Supervisor Momperousse was present during this meeting, took notes and emailed them to CMVP McGovern after the meeting. Docket No. 41-19.

According to Supervisor Momperousse's November 14, 2011 Meeting Notes, CMVP McGovern asked Plaintiff if he wished to file a formal complaint over the hole punch incident, and Plaintiff said he did not, because Mr. Miller apologized to him. Id. CMVP McGovern then reminded Plaintiff that in the future, if a similar incident occurred, Plaintiff had to file a complaint immediately in lieu of investigating it himself. Id. According to Supervisor Momperousse's November 14, 2011 Meeting Notes, CMVP McGovern reminded Plaintiff that he could not take photographs in the office without Defendant's permission in the future because Defendant, as a health-care business, was responsible for adhering to strict regulations regarding client confidentiality. Id. Supervisor Momperousse's November 14, 2011 Meeting Notes make no mention of Plaintiff alleging national origin or age discrimination.

### 10. Defendant Transferred Ms. Hibbert To Another Work Location

On or around November 15, 2011, Defendant's management determined that the working relationship between Plaintiff and Ms. Hibbert could not be repaired, and on that date, Defendant transferred Ms. Hibbert to the Bronx Blended Case Management Program in the Bronx, New York.[17] Docket No. 43 ¶ 59; Docket No. 41-3 ¶¶ 42-43.

---

[17] According to Plaintiff's Complaint, Ms. Hibbert's transfer was not necessarily a positive thing insofar as his Seaview co-workers thereafter viewed him "as an enemy. They don't talk to me, and when a report is needed they are either uncooperative or give me the wrong information."

Plaintiff testified that he believed that Defendant transferred Ms. Hibbert to provide him with a better work environment.  Docket No. 47-1 at 240.  Plaintiff also testified that he "strongly believe[s] that [Defendant] tried to finally find a solution" to the conflict between Plaintiff and Ms. Hibbert.  Id. at 265.  Finally, Plaintiff testified that since Ms. Hibbert's transfer, he has had no contact with her.  Id. at 260.

### 11. Plaintiff Files EEOC Charges

In or around July 2011, Plaintiff filed charges of discrimination under Title VII and the ADEA with the EEOC.  Docket No. 43 ¶ 63; Docket No. 41-21 (copy of the Notice of Charge of Discrimination sent to Defendant to the attention of HR Director Tolle).  In his Charge of Discrimination, Plaintiff alleged that he was subjected to discrimination and/or harassment on the basis of his national origin (Haitian) and age (fifty-something during all relevant periods), and unlawful retaliation for complaining about the discrimination and harassment.  Docket No. 43 ¶ 64; Docket No. 41-21.[18]

On November 7, 2011, EEOC issued a Dismissal and Notice of Right to Sue.  Docket No. 43 ¶ 65.

### v. Plaintiff's Starting Salary And Bi-Annual Salary Increases, Annual Performance Reviews And Annual Performance Bonuses, And Holiday Bonuses

### 1. Plaintiff's Starting Salary And Bi-Annual Salary Increases

When Plaintiff began working for Defendant on March 23, 2009, his salary was

---

Docket No. 1 at 5.  This allegation may relate to Defendant's retaliation claim, as I will discuss below.  See Section III.d., infra.

[18] Plaintiff's Complaint alleges that Defendant discriminated against him by subjecting him to "unequal terms and conditions [in his] employment" and by failing to make his two-year salary increase which he received in March 2011 retroactive to March 23, 2009.  Docket No. 1.  It is unclear whether Plaintiff is also alleging that that failure to retroactively apply his salary increase is part of his retaliation claim, but I will discuss it in that context as well.

$32,000.00 per year. Docket No. 43 ¶ 15; Docket No. 41-3 ¶ 20. Plaintiff has since received bi-yearly salary increases. Docket No. 43 ¶ 16; Docket No. 41-3 ¶ 21.

For example, in 2011, when Plaintiff celebrated his two-year anniversary working for Defendant, his salary rose 5% to approximately $33,600.00 annually. Docket No. 43 ¶ 16; Docket No. 41-20. The salary increase marking Plaintiff's two-year anniversary went into effect on his April 25, 2011 paycheck. Docket No. 41-3 ¶ 47. Defendant made Plaintiff's raise retroactive to March 23, 2011, the actual date of Plaintiff's two-year anniversary, and his April 25, 2011 paycheck therefore contained an additional $141.54 covering the period between March 23, 2011 (his two-year anniversary date) and April 25, 2011 (the date his raise was first reflected on a paycheck).[19] Docket No. 41-3 ¶¶ 47-48.[20]

Next, in March 2013 (after Plaintiff's discrimination complaints, EEOC charge and this lawsuit), Plaintiff's salary rose another 5% to approximately $35,280.00 annually. Docket No. 43 ¶ 16; Docket No. 41-3 ¶ 21.

---

[19] This document states that March 23, 2009 is Plaintiff's two-year anniversary date. Docket No. 41-3 ¶ 48. This is clearly a typographical error as the record demonstrates that Plaintiff began his employment for Defendant on March 23, 2009. As a result, I have corrected the typographical error in my discussion here.

[20] In Plaintiff's Complaint, he agrees that the agency gave him "$141.54 retro[active] pay," but alleges that Defendant should have made the two-year anniversary pay raise retroactive to his March 23, 2009 start date. Docket No. 1 at 6. Plaintiff testified that the reason he believes this to be true is because CM Wefers gave him a form to this effect, although Plaintiff conceded that he may have misunderstood the form. Docket No. 47-1 at 123-29, 139. Plaintiff testified that he still had the form; that he would produce the form in discovery; and that if evidence showed that other employees' salary increases were not made retroactive to their start dates, he would "forget about it." Id. Plaintiff has not entered the form in evidence. By contrast, Defendant has produced evidence in the form of VPO Holman's testimony that the company's policy and practice was not to apply salary increases retroactively to an employee's start date. Docket No. 41-3 ¶¶ 44-48.

## 2. Plaintiff's 2010, 2011 And 2012 Annual Performance Evaluations And 2011, 2012 And 2013 Annual Performance Bonuses

Defendant's policy and practice is to give SCMs like Plaintiff annual performance evaluations. Docket No. 43 ¶ 19. An SCM's Supervisor conducts the annual performance evaluation with oversight from the Human Resources Department and other members of Defendant's management. Id. ¶ 21; Docket No. 41-3 ¶ 25. Plaintiff received such annual performance evaluations every year from 2010 until at least 2012.[21]

In addition, Defendant gives annual bonuses tied to its employees' performances, typically in June of each calendar year. Defendant gave such annual performance bonuses to Plaintiff on June 24, 2011; June 22, 2012; and on some unidentified date in June 2013, all of which issued after his June 2011 and two of which issued after his later discrimination complaints, the EEOC charge and this lawsuit.

When Plaintiff testified about the performance evaluations he received relating to his work as an SCM for Defendant, he stated that he generally viewed them as "good/great" but that in May 2012 Supervisor Momperousse said "one negative thing." Docket No. 47-1 at 166-67. When Plaintiff testified about any less-than-perfect marks he received on his performance evaluations, and in particular the May 2012 evaluation, he did not state that he believed they were motivated by discrimination; instead, Plaintiff explained that any such grade was because a supervisor filling out the form would find it

> hard to say, "Oh Jean Paul. I don't see anything wrong [with] you. I cannot give you [the highest mark], I cannot give you that, even though there is nothing [wrong]." [B]ut [the supervisor] will have to add something [even though] there was clearly no problem with me. If [Defendant] ha[d] four people like me in the office, you

---

[21] The record does not contain evidence that Plaintiff received a 2013 annual performance review.

> [would] have the best office in the whole world and work done on
> time and everything.

Id. at 174. "I'm a four person, I am supposed to get a four always." Id. at 188.

### (1) Plaintiff's May 2010 Performance Evaluation And June 2010 Performance Bonus

In May 2010, Supervisor Yoosuf gave Plaintiff his first performance evaluation, for the period June 2009 through May 2010. Docket No. 43 ¶ 23; Docket No. 41-3 ¶ 26. Supervisor Yoosuf indicated in that evaluation that "[Plaintiff] can be more open to accepting advice from his peers"; that "[Plaintiff] can be more open to suggestions from his colleagues and extend himself to other clients who are not on his caseload"; and that "[Plaintiff's] communication skills have been a major achievement with his clients but minimal with his peers." Docket No. 41-6. Plaintiff reviewed Supervisor Yoosuf's evaluation of his performance and signed it to confirm his receipt of the document. Id. Plaintiff had the opportunity to respond to the evaluation with his own comments, but he did not make any comments. Id.

The record does not indicate whether Plaintiff received a performance bonus in June 2010 (June is the month in which these bonuses are historically awarded). Assuming arguendo, that the record's silence on this point means that Plaintiff did not receive a June 2010 bonus, this was roughly one year before Plaintiff's June 2011 discrimination complaints.

### (2) Plaintiff's May 2011 Performance Evaluation And June 2011 Performance Bonus

In May 2011, CM Director Wefers and Supervisor Momperousse jointly gave Plaintiff his second performance evaluation, for the period May 2010 through May 2011. Docket No. 41-7; Docket No. 41-3 ¶ 27. CM Director Wefers and Supervisor Momperousse collaborated because CM Director Wefers oversaw the transition of Supervisor Momperousse as Supervisor Yoosuf's replacement. The evaluation indicated that "[a]t times, there is friction among

[Plaintiff] and his co-workers and he has difficulty resolving the conflict(s) when they arise";

"[Plaintiff] has a difficult time communicating with his peers effectively [and] can also get into

arguments with his co-workers that can affect the tenor of the office"; "[Plaintiff] does not take

the lead or work as a team member with his co-workers"; and "[Plaintiff] tends to isolate himself

from others at work thus creating tension within the office."  Docket No. 41-7.  Plaintiff

reviewed his May 2011 performance evaluation and signed it to confirm receipt, but not before

adding that he "disagree[d] with the term 'self-isolation' because it does not signify who I am.

The real thing is that I'm excluded and deserve a better grade[.]"  Id.

On June 24, 2011, Plaintiff received an annual performance bonus.  Docket No. 43 ¶¶ 17-

19; Docket No. 41-3 ¶¶ 22-24, 49; Docket No. 41-21.

### (3) Plaintiff's May 2012 Performance Evaluation And June 2012 Performance Bonus

In May 2012, Supervisor Momperousse gave Plaintiff his third performance evaluation,

for the period May 2011 through May 2012.  Docket No. 41-8; Docket No. 41-3 ¶ 30.

Supervisor Momperousse stated that "[Plaintiff] has a difficult time communicating with his

supervisors and peers" and "[Plaintiff] should also provide more assistance in the office as there

is not an administrative assistant[, and so] it is the responsibility of the team to ensure that the

daily office operations run smoothly and efficiently."  Docket No. 41-8.  Plaintiff signed the

evaluation after adding the following comment:  "I disagree with the communication problem

that [does] not exist and the supervisor and other [SCMs] have alienated me as [a] group.  I am

open and do my job and communicate effectively with everyone."  Id.

On June 22, 2012, Plaintiff received an annual performance bonus.[22]  Docket No. 43 ¶¶

---

[22] Plaintiff testified that he believed that his performance bonus was less than his co-workers in
2012; when asked for the basis of his belief, Plaintiff responded that his co-workers "talk, they

17-19; <u>Docket No. 41-3</u> ¶¶ 22-24, 49; <u>Docket No. 41-21</u>.[23]

### 3. Plaintiff's Annual Holiday Bonuses

Finally, on December 20, 2011; December 14, 2012; and December 20, 2013, Plaintiff received holiday bonuses. <u>Docket No. 43</u> ¶¶ 17-19; <u>Docket No. 41-3</u> ¶¶ 22-24, 49; <u>Docket No. 41-21</u>. Defendant gave all such annual holiday bonuses to Plaintiff after his June 2011 and later discrimination complaints, the EEOC charge and this lawsuit. Plaintiff testified that the holiday bonuses were "a favor that I'm not entitled to. I'll always say thanks for it is the Christmas bonus. That's a favor they don't owe [to] me, that [they] give to me." <u>Docket No. 47-1</u> at 196.

### b. Procedural History

On January 23, 2012, Plaintiff filed his Complaint alleging that Defendant violated his rights under Title VII and ADEA. <u>Docket No. 1</u>. On April 3, 2012, Defendants answered. <u>Docket No. 8</u>.

On November 7, 2012, I held an Initial Conference and set a discovery and pretrial schedule. <u>Docket Entry 11/8/2012</u>. On November 30, 2012, Plaintiff moved for a 60-day extension of the discovery schedule. <u>Docket No. 12</u>. I granted the motion in part by extending discovery for 30 days, and set a telephone conference. <u>Docket Entry 12/10/2012</u>.

On January 4, March 1, April 8 and June 7, 2013, I held telephone conferences with the Parties and revised the discovery schedule according to the Parties' requests and Plaintiff's needs. <u>Docket No. 1/28/2013</u>; <u>Docket Entry 3/1/2013</u>; <u>Docket Entry 4/16/2013</u>; <u>Docket Entry 6/7/2013</u>. I regularly gauged the Parties' interest in settlement during these conferences, and at

---

talk, they talk." <u>Docket No. 47-1</u> at 167. Plaintiff introduces this hearsay for the truth of the matter asserted, and it is inadmissible evidence for the purposes of this summary judgment motion.

[23] The record also contains evidence that Plaintiff received an annual performance bonus on June 21, 2013. <u>Docket No. 43</u> ¶¶ 17-19; <u>Docket No. 41-3</u> ¶¶ 22-24, 49; <u>Docket No. 41-21</u>. The record does not contain a corresponding 2013 performance evaluation.

times went off the record in order to manage settlement discussions.  Id.[24]  During these

conferences, I reminded Plaintiff of his evidentiary burden in proving his claims as discovery

deadlines loomed.

Plaintiff submitted a motion for appointment of pro bono counsel, Docket Nos. 23, 25,

but then mooted the motion when he found an attorney named Rony Provincil to represent him,

Docket No. 26; Docket Entry 8/8/2013.  During an August 6, 2013 telephone conference, Mr.

Provincil appeared for Plaintiff and informed me of his intention to file a Notice of Appearance.

Docket No. 8/6/2013.  I extended the discovery schedule so that Mr. Provincil could expand

upon the discovery that Plaintiff had done up to that point, if Mr. Provincil wished to do so.  Id.

On October 28, 2013, Plaintiff wrote a letter to the Court announcing that Mr. Provincil

would not be appearing as his attorney after all.  Docket No. 29.  Plaintiff indicated in that same

letter that he wished to continue representing himself pro se, and indeed, Plaintiff never renewed

his request for appointment of pro bono counsel.  Id.; Docket No. 30 (Mr. Provincil confirming

that he would not enter a Notice of Appearance for Plaintiff).

On December 17 and February 20, 2014, I met with the Parties for an in-person and a

telephone conference, respectively, and the final discovery schedule was set as well as a

summary judgment briefing schedule.  Docket Entry 12/17/2013; Docket Entry 2/20/2014.  Once

again, I discussed with Plaintiff his burdens of proof relating to surviving summary judgment

and succeeding at trial.  Id.

Discovery closed on March 18, 2014.  Docket No. 32.

On April 8, 2014, Defendant requested an adjournment of the summary judgment

---

[24] On April 8, 2013, Plaintiff requested mediation.  Docket No. 16.  At that time Defendant was
unwilling to participate in mediation because it had not yet obtained certain discovery from
Plaintiff, for example, Plaintiff's deposition.  Docket No. 17.  As discussed below, on April 22,
2014, I held a settlement conference once discovery closed.  Docket Entry 4/22/2014.

briefing schedule so that the Parties, with the benefit of completed discovery, could attempt a settlement conference and avoid motion practice. <u>Docket No. 34</u>. As a result, on April 22, 2014, I held a three-hour settlement conference with the Parties, which proved unsuccessful. <u>Docket Entry 4/22/2014</u>.

On August 7, 2014, Defendant filed its bundled motion for summary judgment. Defendant's opening papers included Defendant's notice of motion, <u>Docket No. 39</u>; summary judgment notice particular to <u>pro se</u> plaintiffs, <u>Docket No. 40</u>; affidavit from counsel Michael Abitabilo describing and testifying to the authenticity of various supporting exhibits, <u>Docket No. 41</u>; memorandum of law, <u>Docket No. 42</u>; and Rule 56.1 Statement of Facts, <u>Docket No. 43</u>. Plaintiff opposed with a letter to the Court. <u>Docket Nos. 31, 36, 44</u>.[25] Defendant replied with an affidavit from VPO Holman with supporting exhibits, <u>Docket No. 45</u>, and another memorandum of law, <u>Docket No. 46</u>.

## II. Summary Judgment Legal Standard

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Kwong v. Bloomberg</u>, 723 F.3d 160, 164-65 (2d Cir. 2013); <u>Redd v. N.Y. Div. of Parole</u>, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to

---

[25] I have cited to three documents as part of Plaintiff's response in opposition to Defendant's summary judgment motion. <u>Docket Nos. 31, 36, 44</u>. On February 28, 2014, well before the summary judgment briefing schedule began and before discovery closed, Plaintiff filed the first of these documents, which is a summary of his factual allegations. <u>Docket No. 31</u>. Although this document was not meant to be a response to Defendant's summary judgment motion, I will discuss it for completeness. The second and third of these documents are duplicates of Plaintiff's intended response in opposition to Defendant's summary judgment motion. <u>Docket No. 36</u> (filed by Plaintiff as a stand-alone document before Defendant filed the fully bundled motion); <u>Docket No. 44</u> (filed by Defendant as part of the fully bundled motion). I will hereinafter cite only to <u>Docket No. 44</u>.

determine whether there is a genuine issue for trial." <u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 162 (2d Cir. 2006) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).  The "mere existence of a scintilla of evidence" is not enough to defeat summary judgment; "there must be evidence on which the jury could <u>reasonably</u> find for the [non-moving party]." <u>Jeffreys v. City of N.Y.</u>, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted) (citing <u>Anderson</u>, 477 U.S. at 252).  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." <u>Pinto v. Allstate Ins. Co.</u>, 221 F.3d 394, 398 (2d Cir. 2000).  The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 101 (2d Cir. 2010) (internal citations omitted).

### III.     Discussion

#### a.  Plaintiff's Complaint, Title VII And The ADEA, Generally

Plaintiff brings his hostile work environment, discrimination and retaliation claims under Title VII and the ADEA, alleging that Defendant harassed and discriminated against him due to his national origin and age, then retaliated against him for complaining about it. <u>Docket No. 1</u>.[26]

"Title VII makes it unlawful for an employer 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

---

[26] It should be noted that Plaintiff more frequently calls this claim a harassment claim, and not a hostile-work-environment claim. <u>Docket Nos. 1, 31, 44</u>.  In <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 568-69 (2d Cir. 2000), the Second Circuit reversed the district court's dismissal of a plaintiff's latent hostile work environment claim because "although the complaint did not refer specifically to 'hostile work environment harassment,' it did describe harassment [that the plaintiff] experienced in enough detail to put the claim before the court."

privileges of employment, because of such individual's . . . national origin.'" Brown v. Daikin Am. Inc., 756 F.3d 219, 225-26 (2d Cir. 2014) (citing 42 U.S.C. § 2000e-2(a)(1)).  Title VII also "forbids an employer to retaliate against an employee for, inter alia, complaining of employment discrimination prohibited by Title VII."  Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)).

Similarly, "[t]he ADEA prohibits employers from refusing to hire, discharging, or otherwise discriminating against an employee with regard to compensation, terms, conditions or privileges of employment because of age."  Hrisinko v. N.Y.C. Dep't of Educ., 369 F. App'x 232, 234 (2d Cir. Mar. 11, 2010) (citing to 29 U.S.C. § 623(a)(1)).  The ADEA's protections apply to individuals "at least 40 years of age."  29 U.S.C. § 631(a).  In addition to prohibiting discrimination, the ADEA "makes it unlawful for an employer to retaliate against an individual for opposing such age discrimination."  Ostrowski v. Atl. Mut. Ins. Co., 968 F.2d 171, 180 (2d Cir. 1992) (citing 29 U.S.C. § 623(d)).

Under Title VII and the ADEA, discrimination may take the form of an employer's discrete acts of discrimination or a hostile work environment.  "[A] hostile work environment is one form of disparate treatment on the basis of . . . national origin" under Title VII and on the basis of age under the ADEA.  Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir. 2001); Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (stating that Title VII's hostile work environment standards "apply to hostile work environment claims brought under the ADEA").  "Whereas other disparate treatment claims may scrutinize discrete harms . . . a hostile work environment claim analyses a workplace environment as a whole to discover whether it is abusive."  Raniola, 243 F.3d at 617.

**b. Defendant's Summary Judgment Motion Relating To Plaintiff's National Origin And Age-Based Hostile Work Environment And Discrimination Claims Is Granted Because The Record Does Not Support An Inference Of Discrimination**

**i. Law Relating To The Inference-Of-Discrimination Requirement**

According to the Second Circuit in <u>Alfano v. Costello</u>, 294 F.3d 365, 373-74 (2d Cir. 2002), "it is axiomatic" that a plaintiff bringing a Title VII national origin claim or an ADEA claim based on a hostile work environment or a discrete act of discrimination must show that the offending conduct was motivated by the plaintiff's national origin or age, respectively. The importance of this element cannot be overstated. As applied here, the <u>sine</u> <u>qua</u> <u>non</u> of Plaintiff's Title VII national-origin claims is that Defendant discriminated against him due to his Haitian national origin and the <u>sine</u> <u>qua</u> <u>non</u> of Plaintiff's ADEA claims is that Defendant discriminated against him due to his age. <u>See</u> <u>Patane v. Clark</u>, 508 F.3d 106, 112 (2d Cir. 2007) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic."). Under Title VII, a plaintiff can make a <u>prima</u> <u>facie</u> showing of an employer's actionable discrimination with evidence that the employer acted against the plaintiff based solely upon his or her membership in a protected class, or "because of both permissible and impermissible considerations—<u>i.e.</u>, a 'mixed-motives' case." <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 169 (2009). By contrast, an ADEA plaintiff makes a <u>prima</u> <u>facie</u> case of an employer's actionable discrimination by showing that his or her age was the "but for" cause of the complained-of disparate treatment; the ADEA does <u>not</u> permit a "mixed motives" theory of recovery. <u>See</u> <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 168 (2d Cir. 2014). Perhaps obviously, Title VII's "mixed-motive" standard is more lenient than the ADEA's "but-for" standard. <u>See</u> <u>Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.</u>, 973 F. Supp. 2d 386, 403 n.10 (S.D.N.Y. 2013), <u>aff'd by</u> 586 F. App'x 739 (2d Cir. 2014); <u>see</u> <u>also</u>

33

Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989) ("In determining whether a particular

factor [such as a plaintiff's age] was a but-for cause of a given event, we begin by assuming that

that factor was present at the time of the event, and then ask whether, even if that factor had been

absent, the event nevertheless would have transpired in the same way.").  A plaintiff alleging a

hostile work environment must show that it occurred due to his or her protected status under

Title VII and the ADEA, although the analysis may be slightly different than when a plaintiff

alleges discrimination based upon a discrete adverse employment action due to differences in the

nature of the two claims.  See Alfano, 294 F.3d at 373.

> ### ii. The Record Does Not Support A Finding Of An Inference Of Discrimination On Plaintiff's Title VII Or ADEA Hostile-Work-Environment And Discrimination Claims

### 1. The Hostile-Work-Environment Claims

At the outset, I note that the record shows that Ms. Hibbert's and Mr. Miller's September

2010 comments that Plaintiff cannot be "boss" because he is old and Haitian, and that the day

trip was for young people, are the only two remarks referencing Plaintiff's national origin and

age in the nearly six years he has worked for Defendant.[27]  "This is the very definition" of what

---

[27] See Docket No. 41-9 (Supervisor Momperousse's notes from her investigation of Plaintiff's June 2011 complaints, which make no mention that any of the incidents involved remarks relating to Plaintiff's national origin or age); Docket No. 41-10 (HR Director Tolle's notes from her investigation of Plaintiff's June 2011 complaints, which make no mention that any of the incidents involved remarks relating to Plaintiff's national origin or age); Docket No. 41-12 (Plaintiff's notes about the June 2011 incident on his Performance Correction Notice, which make no mention that any of the incidents involved remarks relating to Plaintiff's national origin or age, although they do complain anew about the September 2010 "old Haitian" insult and excursion exclusion); Docket No. 41-14 (Supervisor Momperousse's notes from her investigation of Plaintiff's August 12, 2011 complaints, which make no mention that any of the incidents involved remarks relating to Plaintiff's national origin or age); Docket No. 41-17 (Supervisor Momperousse's notes from her investigation of Plaintiff's October 13, 2011 complaints, which make no mention that any of the incidents involved remarks relating to Plaintiff's national origin or age); Docket No. 41-18 (Supervisor Momperousse's notes from her investigation of Plaintiff's November 9, 2011 complaints, which make no mention that any of the

constitutes "stray remarks" under employment discrimination law.  See Wesley-Dickson, 973 F. Supp. 2d at 406 (granting summary judgment for the defendants on the plaintiff's race-based hostile-work-environment claim, stating that although the plaintiff had highlighted "various items that made her work life unpleasant," the "two discriminatory comments regarding her race" were not sufficient to "link[] those items to racial hostility"); Cadet v. Deutsche Bank Sec. Inc., No. 11 Civ. 7964 (CM), 2013 WL 3090690, at *10 (S.D.N.Y. June 18, 2013) (finding that a staffer's three hostile and racially tinged comments about the plaintiff over the course of the plaintiff's three years of employment were stray remarks); Waldo v. N.Y.C. Health & Hosp. Corp., No. 06 Civ. 2614 (SLT) (LB), 2009 WL 2777003, at *16-17 (E.D.N.Y. Aug. 31, 2009) (granting the defendant's motion for summary judgment on the plaintiff's national-origin-based and gender-based hostile work environment discrimination claims because "[t]he record reflects only two incidents that invoke national origin or gender discrimination" and, as a result, the plaintiff "fails to show that the environment was because of his national origin or gender"); Rissman v. Chertoff, No. 08 Civ. 7352 (DC), 2008 WL 5191394, at *2 (S.D.N.Y. Dec. 12, 2008) (dismissing the pro se plaintiff's race- and religion-based hostile-work-environment claim sua sponte because, inter alia, despite the plaintiff's "litany of facts regarding his mistreatment by co-workers and supervisors," "[t]he few facts alleged by plaintiff relating to his race or religion do not amount to more than stray remarks made by co-workers and cannot support a plausible claim of hostile work environment").

In Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998), the Second Circuit

---

incidents involved remarks relating to Plaintiff's national origin or age, although noting that Plaintiff discussed the persecution of people of the Jewish faith and Iranians); Docket No. 41-19 (Supervisor Momperousse's notes of CMVP McGovern's meeting with Plaintiff regarding the November 9, 2011 complaints, which make no mention that any of the incidents involved remarks relating to Plaintiff's national origin or age).

concluded that "'stray remarks' alone do not support a discrimination suit," and so, as a result, Ms. Hibbert's and Mr. Miller's stray remarks here cannot establish the inference of discrimination necessary for a prima facie hostile-work-environment claim. See Hassan v. City of Ithaca, N.Y., No. 10 Civ. 6125 (MAT), 2012 WL 1190649, at *6 (W.D.N.Y. Apr. 9, 2012) (granting the defendants' motion to dismiss, stating that a plaintiff's allegation that his co-worker's stray remarks about people of Middle-Eastern descent could not alone establish inference of discrimination to support a hostile work environment claim); Rissman, 2008 WL 5191394, at *3 (dismissing the plaintiff's hostile work environment claim because a co-worker's statement that the plaintiff only criticized an anti-Semitic movie because his rabbi told him to, or other co-worker's "many comments to make him feel left out as one of the few non-Hispanic white person," "do not amount to more than stray remarks").

It is because "[e]veryone can be characterized by sex, race, ethnicity, [age], or (real or perceived) disability" that "[i]t is therefore important in hostile work environment cases to exclude from considerations [acts taken against the plaintiff] that lack a linkage or correlation to the claimed ground of discrimination." Alfano, 294 F.3d at 377. At the same time, the Second Circuit has recognized that even if "the majority of incidents" cited by a plaintiff are neutral with respect to the plaintiff's protected status," under certain circumstances, "one single discriminatory incident may be enough to allow an inference that those "[f]acially neutral incidents" were also motivated by impermissible discrimination. Id. "But this requires some circumstantial or other basis for inferring that incidents [status]-neutral on their face were in fact discriminatory." Id.; see Schiano v. Quality Payroll Sys., Inc., 445 F.3d 397, 605 n.5 (2d Cir. 2006) (citing Alfano, 294 F.3d at 377).

The Second Circuit found just such a basis on the unique facts of Howley v. Town of

Stratford, 217 F.3d 141, 155 (2d Cir. 2000), stating that the plaintiff's co-worker's single tirade insulting and ridiculing her on the basis of her sex could, on summary judgment, suffice to support an inference of discrimination relating to that same co-worker's subsequent status-neutral acts. The plaintiff's claim principally relied upon an incident at a meeting attended by a roomful of her colleagues in which a subordinate co-worker told her to "shut the fuck up, you fucking whining cunt"; made comments about her menstrual cycle; responded to suggestions that he apologize by saying that "[t]here is no fucking way that I will fucking apologize to that fucking cunt"; and "launched into an extended barrage of obscene verbal abuse, including the remark that she did not gain a recent promotion she had sought because she did not "suck cock good enough." Id. at 148. The co-worker thereafter refused to follow the plaintiff's orders; made false statements about the plaintiff's authority to other subordinates; and created safety hazards for the plaintiff. Id. at 149. The Howley Court ruled that although none of these acts was overly discriminatory, "a factfinder would be entitled to infer that any harassment [the defendant] directed at [the plaintiff] thereafter, with or without obscenities, was gender-based." Id. at 156.

But this case is very different from Howley. Although regrettable if they occurred, the September 2010 remarks are not as severe in content or context as the "extended barrage of obscene verbal abuse" that the Howley plaintiff's co-worker unleashed upon her in a roomful of her colleagues. Here, the remarks were relatively brief, and, although the record does not indicate the surroundings in which they were made, Plaintiff worked alongside Ms. Hibbert and Mr. Miller in a small, rectangular, four-person office. Furthermore, the September 2010 remarks were followed by five alleged occasions of Ms. Hibbert's and Mr. Miller's additional poor treatment of Plaintiff (the first of which did not occur until June 15, 2011, nearly eight months

later), whereas in <u>Howley</u>, the co-worker's outburst was followed by what was characterized as a steady campaign to undermine the plaintiff's authority. Additionally, here, Plaintiff's authority has not been undercut by the remarks, as he, Ms. Hibbert and Mr. Miller are all SCMs of equal status. In sum, the facts surrounding the September 2010 remarks are not so extraordinary as to justify an exception to the general rule that stray remarks cannot plausibly show an inference of discrimination to support a hostile-work-environment claim.

Next, roughly ten months separate the September 2010 "old Haitian" insult and the excursion exclusion, and the next complained-of incident, which was the June 15, 2011 telephone disinfectant event. The ten-month gap between Plaintiff's co-workers' only alleged remarks about his national origin and age and the telephone disinfectant issue is so extended that it cannot allow an inference that Ms. Hibbert cleaned the phone because Plaintiff was "old" or Haitian. <u>See</u> <u>Howard v. City of N.Y.</u>, -- F. App'x --, No. 14 Civ. 409 (JMF) (JCF), 2015 WL 895430, at *2 (2d Cir. Mar. 4, 2015) (stating that the ten-month gap between the racial remark and the termination of the plaintiff's permit made the events too remote from one another to allow an inference about motivation).

"The labor market place, not federal employment law, is charged with remedying non-actionable abusive workplaces to the extent possible by attracting better employees to more satisfying places to work." <u>Rivera v. Brooklyn Hosp. Med. Ctr.</u>, 28 F. Supp. 3d 159, 162 (E.D.N.Y. 2014). It should also be noted that Plaintiff testified that he was satisfied with VPO Holman's response to his complaint about the September 2010 "old Haitian" insult and the September 2010 excursion exclusion which, again, is the only evidence in the record of discriminatory remarks. Plaintiff testified that he either emailed or telephoned VPO Holman about Ms. Hibbert's and Mr. Miller's 2010 comments, and VPO Holman held a meeting with

Plaintiff, Ms. Hibbert and Mr. Miller to discuss the matter:

> [VPO Holman] called all of us in a meeting, not only me, she
> heard all of us and counseled all of us [in] the best possible way. . .
> . [Her message was about] working together for the benefit of the
> clients. . . . [She] did not discuss who is wrong and who is right,
> she only counseled us to work together.

Docket No. 47-1 at 217-18.  Plaintiff also testified that if every response to his complaints was

like VPO Holman's response, "I think there w[ould] be no place for aggravation. . . . [W]e will

[have] a better workplace, she's a very good person, I happen to not have anything to say bad

about her."  Id. at 216.[28]

## 2.  The Discrimination Claims

Additionally, Ms. Hibbert's and Mr. Miller's status as Plaintiff's co-workers is relevant

in the context of Plaintiff's discrimination claims, which are based upon the discrete and

materially adverse employment actions that Plaintiff's supervisors allegedly took against him.

That is because Ms. Hibbert and Mr. Miller, as Plaintiff's co-workers, never had any decision-

making authority with respect to those matters.

For example, in Dixon v. International Federation of Accountants, 416 F. App'x 107, 110

(2d Cir. 2011), the Second Circuit affirmed the district court's dismissal of the plaintiff's age,

race and national origin employment discrimination claims on summary judgment due to her

failure to establish the inference-of-discrimination element of a prima facie case.  In reaching

this conclusion, the Second Circuit observed that plaintiff's evidence consisted solely of "an

isolated derogatory remark made by [an employee] who played no role in the plaintiff's

termination."  Id. at 110.  According to the Second Circuit, it has "long held that stray comments

---

[28] In light of Plaintiff's expressed satisfaction with VPO Holman's response to the September
2010 remarks, a jury could not reasonably find that Defendant's management were responsible
for or permitted Ms. Hibbert's and Mr. Miller's alleged discrimination against Plaintiff due to his
national origin and age.

of this variety do not create an inference of discrimination." Id.; see Cai v. Wyeth Pharm., Inc., No. 09 Civ. 5333 (GBD), 2012 WL 933668, at *7 (S.D.N.Y. Mar. 19, 2012) ("[I]t has been settled that stray remarks by a non-decision maker are insufficient to establish a prima facie case of . . . discrimination."); see also Howard, 2015 WL 895430, at *2 (affirming a district court's summary judgment dismissal of the plaintiff's Section 1983 race discrimination claim based upon a non-decision-maker tennis park attendant's treatment of the plaintiff which, inter alia, included the remark that the non-decisionmaker "did not want [the plaintiff's] white ass here").

A similar conclusion that Plaintiff has not presented a plausible inference of discrimination is appropriate here because, as in Dixon, Ms. Hibbert and Mr. Miller are not decision-making employees for Defendant; therefore, their remarks cannot establish an inference of discrimination as to any complained of discrete and materially adverse employment actions taken by Defendant's management. Docket No. 47-1 at 57, 58, 150, 151 (Plaintiff acknowledging that Ms. Hibbert and Mr. Miller are his fellow SCMs who do the same type of work as Plaintiff); see Missick v. City of N.Y., 707 F. Supp. 2d 336, 355 (E.D.N.Y. 2010) ("[A] claim that 'my co-worker is unpleasant, or even that 'my co-worker is a racist,' does not, standing alone, support a claim for a hostile work environment.") (citation omitted); cf. Boakye-Yiadom v. Laria, No. 09 Civ. 622 (DRH) (ARL), 2012 WL 5866186, at *7 (E.D.N.Y. Nov. 19, 2012) (finding that the record in a national origin discrimination case providing evidence of pretext because the decision-maker recommended the plaintiff's termination two months after making a negative comment about the plaintiff's accent).

The irrelevance to the Title VII and ADEA claims of the remarks of non-decision-makers Ms. Hibbert and Mr. Miller that Defendant would not promote someone of Plaintiff's national origin or age is further highlighted by the fact that there is no allegation or evidence that a

promotion was available at the time, let alone that Plaintiff had applied for or was under consideration for one. See Libront v. Columbus McKinnon Corp., 832 F. Supp. 597, 627 (W.D.N.Y. 1993) (finding that no inference of discrimination could be drawn from the defendant's failure to offer plaintiffs the opportunity for a transfer because there is no evidence that there were any transfers available during the period in question). Later in the year 2010, or at the latest in earlier 2011, a supervisor position did come available, but there is no allegation or evidence that Plaintiff applied for the post such that his claim that the non-decision-makers' stray remarks establish a prima facie inference of discrimination are without merit. See Dellaporte v. City Univ. of N.Y., 998 F. Supp. 2d 214, 228 (S.D.N.Y. 2014) (finding that the plaintiff failed to put forth any evidence from which discriminatory intent could be inferred on a failure-to-promote theory because the plaintiff did not apply and was unable to cite to any law "for the proposition that failure to consider a plaintiff for a promotion for which he did not apply ipso facto gives rise to an inference of discrimination").

The lack of relationship between the non-decision-makers' stray remarks and Defendant's own practices regarding the promotion of individuals regardless of their national origin and age is further highlighted by the fact that the successful candidate for the aforementioned position was Supervisor Momperousse, who is of Haitian descent. Docket No. 41-3 ¶ 16.

Indeed, Defendant was willing to consider and propose a promotion for Plaintiff as well, but Plaintiff turned it down. Thus, the Hibbert/Miller remark was patently wrong. In July 2011, CMVP McGovern asked Plaintiff if he would like her to explore the possibility of promoting him to the position of ICM, with a related salary increase, and Plaintiff declined the offer. Docket No. 41-14; Dellaporte, 998 F. Supp. 2d at 228 (stating that "failure to apply" cannot ipso

facto give rise to an inference that failure to promote was motivated by discriminatory animus).

Finally, Plaintiff continues to work for Defendant at the same level as a SCM nearly six years later, and he has received at least two salary increases since he joined Defendant as an SCM.

Docket No. 41-3 ¶¶ 15-16.

### c. Assuming, __Arguendo,__ That The Record Could Plausibly Support An Inference Of Discrimination Relating To Plaintiff's Title VII And ADEA Hostile Work Environment And Discrimination Claims, These Claims Suffer Many Other Deficiencies

Having found that Plaintiff's Title VII and ADEA hostile work environment and discrimination claims fail due to the record's inability to support a plausible inference of national-origin or age discrimination, Defendant's motion is granted, and Plaintiff's hostile work environment and discrimination claims are dismissed.  In light of Plaintiff's pro se status, I will review the lack of evidence as to other elements which are similarly fatal to his hostile work environment and discrimination claims.

### i. Plaintiff's Hostile Work Environment Claims Fail Because The Alleged Attempted Shooting And The Rest Of The Alleged Incidents Do Not Collectively Constitute A Hostile Work Environment

#### 1. Law Relating To What Conduct Is Sufficiently Severe And Pervasive To Constitute A Hostile Work Environment

Hostile work environment claims also require that a plaintiff show that the complained-of "misconduct in the workplace is so severe as to alter the terms and conditions of the plaintiff's employment." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014); see Kassner v. 2d Ave. Delicatessen Inc., 496 F.3d 229, 240 (2d Cir. 2007).  That is because Title VII and the ADEA do not set forth "a general civility code for the American workplace." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (making this statement with respect to Title VII); Almontaser v. N.Y.C. Dep't of Educ., No. 13 Civ. 5621 (ILG) (VMS), 2014 WL 3110019, at *8

(E.D.N.Y. July 8, 2014) (applying the principle to the ADEA).

In order to show that severe workplace misconduct altered the terms and conditions of a plaintiff's employment, a plaintiff must present evidence that the defendant created, either through a single and "extraordinarily severe" incident or through a series of "sufficiently continuous and concerted" incidents, a workplace "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013) (citation omitted); see Kassner, 496 F.3d at 240 (restating the "permeated with discriminatory intimidation, ridicule, and insult" standard for an ADEA claim); Terry, 336 F.3d at 148 (noting that "while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse") (quotations, citations & emphasis omitted).

The possibility of finding that a single incident or series of incidents created an actionable level of hostility also depends upon the Title VII or ADEA plaintiff showing that "a reasonable person would find [the environment] hostile or abusive," and that the victim himself "subjectively perceive[d] the environment to be abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993) (discussing the standard in the context of Title VII); see Terry, 336 F.3d at 148 (stating that the test for a hostile work environment has objective and subjective elements and that "[t]he same standards apply to hostile work environment claims brought under the ADEA"). If the plaintiff cannot make both of these showings, then the plaintiff does not have a Title VII or ADEA hostile work environment claim. Harris, 510 U.S. at 21-22 (discussing the standard in the context of Title VII); see Terry, 336 F.3d at 148 (stating that the test for a hostile work

environment has objective and subjective elements and that "[t]he same standards apply to hostile work environment claims brought under the ADEA").

In the end, all of this comes together in an "[im]precise" totality of the circumstances test, which the Supreme Court has said may include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23. Finally, as to the requirement that a hostile work environment plaintiff show that he "subjectively perceive[d] the environment to be abusive," the Supreme Court mentioned that "[t]he effect on the employee's psychological well-being" could be relevant. Id. The Court emphasized that there is no one determinative factor in the objective or subjective test. Id.

### 2. The Alleged June 16, 2011 Attempted Shooting Does Not Support Plaintiff's Hostile Work Environment Claim

The alleged June 16, 2011 attempted shooting does not support Plaintiff's hostile work environment claim. First, there is insufficient evidence to connect the alleged incident to Ms. Hibbert. Second, there is no specific basis for imputing the incident to Defendant as a matter of law because the alleged attempted shooting occurred while Plaintiff was off-site and not engaged in work-related duties. Third, a totality-of-the-circumstances analysis of Defendant's response to Plaintiff's complaint would not permit holding Defendant liable for the attempted shooting, either. Fourth, the record evidence supporting Plaintiff's allegation that the attempted shooting occurred suffers from such grave credibility concerns there is no genuine issue of material fact for a jury to decide. For these reasons, the alleged shooting incident does not support Plaintiff's case.

**(1) The Alleged June 16, 2011 Attempted Shooting Does Not Support Plaintiff's Hostile Work Environment Claim Because The Admissible Evidence Does Not Support That Ms. Hibbert Was Involved**

The record does not support the conclusion that Ms. Hibbert or any of Plaintiff's co-workers was involved in the alleged attempted shooting. In light of the fact that Plaintiff relies upon the alleged attempted shooting as an incident contributing to a hostile work environment, he "must come forward with admissible evidence [supporting that it occurred] to raise a genuine issue of material fact for trial in order to avoid summary judgment." CILP Assoc., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). Hearsay is not admissible evidence when offered for the truth of the matter asserted, and as such cannot defeat summary judgment. See Gray v. Denny's Corp., 535 F. App'x 14, 16 (2d Cir. 2013) (rejecting the defendant's argument that the plaintiff could not defend against summary judgment with hearsay because the plaintiff had not propounded the hearsay for the truth of the matter asserted).

Plaintiff's alleged proof that Ms. Hibbert was involved in the alleged attempted shooting begins with the allegation that Ms. Hibbert said "[w]e will shoot you out of here" to Plaintiff the day before the alleged attempted shooting. Docket No. 41-9; Docket No. 41-10. Because this remark is in the record solely through Plaintiff's testimony that that is what Ms. Hibbert said, I cannot consider that statement as a fact that supports the claim that Ms. Hibbert was or intended to be involved in the shooting because to do so would be to take that statement for the truth of the matter asserted. I have taken into account that Plaintiff's assertion that Ms. Hibbert made this remark does not appear to fall under any hearsay exclusion or exception. See Fed. R. Evid. 801-807.

That leaves Plaintiff's allegation that he encountered his assailants as they stood on the sidewalk in front of Ms. Hibbert's sister's home, which Plaintiff testified is located two blocks

from Plaintiff's office.  <u>Docket No. 41-9</u>; <u>Docket No. 41-10</u>; <u>Docket No. 47-1</u> at 225.  I find that

this is an inadmissible fact as well.  The "fundamental general rule of evidence [is] that a witness

must confine his testimony to matters within his personal knowledge." <u>Contreras v. Artus</u>, 778

F.3d 97, 109 (2d Cir. 2015) (citing <u>People v. Mingey</u>, 190 N.Y. 61, 64 (1907)).  Here, the record

contains no foundation establishing that Plaintiff knows where Denise Hibbert lives.  Plaintiff

testified that he knew that Ms. Hibbert's sister lived in the house in question because she "came

to the office, I have seen her, I know where she lives."  <u>Docket No. 47-1</u> at 237.  When pressed

by defense counsel for more information about the source of his knowledge of Denise Hibbert's

address, Plaintiff simply responded, "I know."  <u>Id.</u> at 238.

Even if Plaintiff could establish the necessary foundation to introduce this fact in

evidence at trial, a reasonable jury could not find this lone fact—that the alleged attempted

shooting occurred in front of Ms. Hibbert's sister's house two blocks from the office—sufficient

to support a conclusion that Ms. Hibbert had been in any way involved in the group of five to ten

men shooting at Plaintiff.

Additionally, Plaintiff offers no evidence that the men were connected to Ms. Hibbert.

For example, he does not place them in the house; he does not report that he knew of any

relationship between Ms. Hibbert and the men; he did not recognize any of the men despite the

fact that members of Ms. Hibbert's family had visited her in the office; and he does not offer any

evidence that Ms. Hibbert communicated with any member of the gang of men.  Plaintiff does

not introduce any of Ms. Hibbert's telephone records to show suspect communications or

activities, were they even to exist.

Moreover, despite numerous discovery conferences and communications between the

Parties about discovery, Plaintiff did not pursue any such evidence or identify any source for the

information, such as a police investigation or a deposition or interrogatories directed to Ms.

Hibbert.  In sum, Plaintiff's innuendo that Ms. Hibbert was involved in a dangerous felony is

completely unsupported by any admissible evidence from any source.  Thus, there is insufficient

evidence to show that Ms. Hibbert was involved in the alleged activity.  Without evidence of Ms.

Hibbert's involvement in the attempted shooting, the attempted shooting is irrelevant to

Plaintiff's hostile work environment claims.

> **(2) The Alleged June 16, 2011 Attempted Shooting Does Not Support Plaintiff's Hostile Work Environment Claims Because There Is No Specific Basis For Imputing The Incident To Defendant**

Assuming, <u>arguendo</u>, that the admissible evidence in the record could support that Ms.

Hibbert was involved in the alleged attempted shooting (which I conclude it cannot), there is no

specific basis for holding Defendant liable for the alleged attempted shooting.

A plaintiff who has suffered a hostile work environment at the hands of a co-worker must

show that "there is a specific basis for imputing the conduct creating the hostile work

environment to the employer" before the employer can be held liable.  <u>Summa v. Hofstra Univ.</u>,

708 F.3d 115, 124 (2d Cir. 2013) (citing <u>Duch v. Jakubek</u>, 588 F.3d 757, 762 (2d Cir. 2009)).

"[W]hen the harassment is attributable to a coworker, rather than a supervisor, . . . the employer

will be held liable only for its own negligence."  <u>Duch</u>, 588 F.3d at 762 (quoting & citing

<u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 63 (2d Cir. 1998)).

Generally, an employer is not liable as a matter of law for harassment resulting "from

nonwork-related, off-duty interactions between co-employees because those actions are not part

of the work environment."  <u>See Devlin v. Teachers' Ins. & Annuity Ass'n of Am.</u>, No. 02 Civ.

3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting the defendant's motion

for summary judgment on the plaintiff's sexual harassment claim because, <u>inter alia</u>, the

plaintiff's co-worker's acts occurred at a bar outside of work hours) (quotation & citation omitted).  There are exceptions to this rule, for example, where the nature of the employer's business requires off-duty interactions with a co-worker, or a supervisor uses his authority to compel the victim of harassment to meet outside the office.  See id. (citing Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001)).

Here, the alleged June 16, 2011 attempted shooting occurred while Plaintiff was on a public sidewalk during his lunch hour and not engaged in work-related duties.  As a result, Defendant cannot be liable as a matter of law for the alleged attempted shooting.  See Krause v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 10 Civ. 2603 (RMB), 2011 WL 1453791, at *4 (S.D.N.Y. Apr. 13, 2011) (granting the defendant employer's motion for summary judgment because, inter alia, the plaintiff's allegation that her co-worker's two uninvited attempts to kiss her were not actionable under Title VII because "these incidents . . . occurred 'off-site' and without any [employer] involvement"); Osier v. Broome Cnty., 47 F. Supp. 2d 311, 321 (N.D.N.Y. 1999) (granting the defendants' motion for summary judgment because, inter alia, the court did not consider the plaintiff's allegation that a co-worker had tailgated her car as part of her discrimination claim because it was not included in the EEOC charge "plus, this occurred outside of work"); see also Crawford v. Lutheran Med. Ctr., No. 08 Civ. 3429 (NGG) (LB), 2011 WL 887806, at *4-6 (E.D.N.Y. Mar. 14, 2011) (dismissing the plaintiff's disparate treatment and hostile work environment claims under FRCP 12(b)(6) because her allegations that her co-workers "became deeply embroiled in her personal life" "amount to nothing more than impolite meddling in [the p]laintiff's personal life").  There is no evidence in the record of any Ferris-like facts arguably establishing a specific basis for imputing the alleged shooting to Defendant.

Even if Plaintiff could establish some connection between the alleged attempted shooting

on the public sidewalk and the workplace, there still would be no specific basis for imputing the

act to Defendant because the record does not show that Defendant, upon hearing Plaintiff's

complaint about the "[w]e are going to shoot you out of here" remark, "failed to take appropriate

remedial action." Duch, 588 F.3d at 762 (quoting Howley, 217 F.3d at 154).[29] "The

appropriateness of an employer's remedial action must be assessed from the totality of the

circumstances," Turley v. ISG Lackawanna, 774 F.3d 140, 153 (2d Cir. 2014) (quotation &

citation omitted), which include "the gravity of the harm being inflicted upon the plaintiff, the

nature of the employer's response in light of the employer's resources, and the nature of the

work environment," Distasio, 157 F.3d at 65.[30]

　　　The totality of the circumstances plainly do not provide a specific basis for imputing the

alleged attempted shooting to Defendant because there is no evidence that Defendant "failed to

take appropriate remedial action" in response to Plaintiff's complaint the morning of June 16,

2011. Duch, 588 F.3d at 762 (quoting Howley, 217 F.3d at 154). Plaintiff does not offer

evidence that Defendant's response to his complaint about the "[w]e will shoot you out of here"

remark was not appropriate given that Plaintiff made the complaint and then left the premises for

[29] Plaintiff could also try to establish Defendant's negligence by showing that Defendant "failed to provide a reasonable avenue for complaint," but this is not Plaintiff's theory. Indeed, Plaintiff did complain to Defendant's management about the June 15, 2011 incidents. Docket No. 41-4 (Defendant's EEO policy outlining the procedure for reporting alleged incidents of discrimination and harassment); Docket No. 41-5 (Plaintiff's acknowledged receipt of the EEO policy); see Ciccotto v. LCOR, Inc., No. 99 Civ. 11646 (RMB), 2001 WL 5143404, at *8 (S.D.N.Y. Jan. 31, 2001) (stating that the defendant's EEO policy was evidence that it provided a reasonable avenue for complaint).

[30] A plaintiff does not have the right to choose an employer's remedial action. See Wahlstrom v. Metro-North Commuter Ry. Co., 89 F. Supp. 2d 506, 525 (S.D.N.Y. 2000); Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 63 (2d Cir. 1992) ("[N]ot every response to a complaint should take the form of discharge."). "Rather, [the remedial action] should be sufficiently calculated to end the harassment" and "[e]ven a mere written warning can be an appropriate response if it conveys the message that further harassment will not be tolerated." Wahlstrom, 89 F. Supp. 2d at 525-26.

lunch, which is when the alleged attempted shooting occurred. In light of this timeline, Defendant had almost no opportunity to respond prior to the alleged incident. Further, Defendant was not on notice of the alleged gravity of the situation because Plaintiff provided Defendant no information that could have led Defendant to believe that Plaintiff was in any danger; indeed, Plaintiff testified that the "we will shoot you out of here" comment had a number of interpretations. Docket No. 47-1 at 56-58.[31] Indeed, Plaintiff testified that he told CM Director Wefers that the "shoot you out of here remark" was "open to many interpretations." Id. at 56-58.

Then, in the days and weeks after the alleged attempted shooting, the totality of the circumstances still do not permit a finding that Defendant failed to take appropriate remedial action. Defendant enacted a speedy schedule for addressing Plaintiff's complaint about Ms. Hibbert's alleged conduct. On June 17, 2011, HR Director Tolle interviewed Plaintiff and Ms. Hibbert pursuant to an investigation of Plaintiff's complaint. Docket No. 43 ¶ 38; Docket No. 41-3 ¶¶ 32-33; Docket No. 41-10. Shortly thereafter, HR Director Tolle met with CEO Barak to discuss her findings and develop a Plan, and on June 29, 2011, HR Director Tolle emailed the Plan to CMVP McGovern, CM Director Wefers, Supervisor Momperousse and VPO Holman, which entailed the issuance of Performance Correction Notices to both Plaintiff and Ms. Hibbert on July 7 and July 11, 2011, respectively, as well as a longer-term strategy to transfer one of them to a new office if they proved unable to get along moving forward. Docket No. 43 ¶ 42;

---

[31] Defendant had no reason to be on constructive notice that Ms. Hibbert could be considered to be criminally violent, either. Ms. Hibbert's alleged September 2010 remarks about Plaintiff's national origin and age were non-violent. Docket No. 43 ¶ 35; Docket No. 47-1 at 210; see Rivera v. Edenwald Contracting Co., Inc., No. 93 Civ. 8582 (LAP), 1996 WL 240003, at *4 (S.D.N.Y. May 9, 1996) ("Knowledge of harassment may include constructive notice (i.e., management should have known.") (quotation & citation omitted). Of course, the Court does not find that Ms. Hibbert is violent, but only that Plaintiff makes such an allegation.

Docket No. 41-3 ¶ 36; Docket No. 41-11; Docket No. 41-12; Docket No. 41-13; see Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (affirming the district court's grant of summary judgment for the defendant on sexual harassment claim, finding that the defendant's response to the employee's complaint of harassment was sufficient because the defendant began an investigation, interviewed all involved parties and reprimanded the harasser within four days, and terminated the harasser within ten days for another incident); Lee v. Sony BMG Music Entm't, Inc., No. 07 Civ. 6733 (CM), 2010 WL 743948, at *9 (S.D.N.Y. Mar. 3, 2010) (granting summary judgment for the defendant employer because, inter alia, "[t]he fact that management did not deal with the incident . . . by separating [the plaintiff] from [her alleged harasser] does not make [the plaintiff's] work environment 'hostile' as required by law"); Gonzalez v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 355 (S.D.N.Y. 2003) (granting summary judgment for the defendant employer because, inter alia, the employer's remedial action to a harassment complaint was appropriate because the employer "received [the plaintiff's] complaint in a professional manner, and interviewed several individuals involved with the situation in a timely fashion" that elicited information permitting a conclusion); Wahlstrom v. Metro-North Commuter Ry. Co., 89 F. Supp. 2d 506, 525 (S.D.N.Y. 2000) (granting the employer defendant's summary judgment motion because, inter alia, "no reasonable jury could find that [the employer defendant] neglected its obligation to take prompt and effective action to remedy" a harassment complaint when, pursuant to a collective bargaining agreement, it initiated a six-week-long process which culminated in reprimanding the harasser for his actions). Eventually, Defendant transferred Ms. Hibbert to another office in order to separate Plaintiff and Ms. Hibbert. Docket No. 41-3 ¶ 43; see Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 266 (E.D.N.Y. 2005) (granting summary judgment for the defendant employer because, inter

*alia*, the defendant employer held numerous meetings between conflicting employees and effected a transfer in order to separate them). Plaintiff testified that Defendant effected this transfer to provide him with a better working environment, and that he "strongly believe[s] that [Defendant] tried to find a solution" for the conflict between him and Ms. Hibbert. Docket No. 47-1 at 265.

> ### (3) The Alleged June 16, 2011 Attempted Shooting Does Not Support The Plaintiff's Hostile Work Environment Claims Because There Is No "Genuine" Issue Of Material Fact As To Whether It Occurred

Assuming, arguendo, that the alleged June 16, 2011 attempted shooting could be relevant to Plaintiff's workplace discrimination claim despite its occurrence off-site while Plaintiff was not working (which I conclude it cannot), that the admissible evidence in the record could support that Ms. Hibbert was involved (which I conclude it cannot), and that there is a specific basis for imputing the incident to Defendant (which I conclude there is not), the record cannot support that the alleged June 16, 2011 attempted shooting occurred because "there is nothing in the record to support the plaintiff's allegations . . . aside from his own contradictory and incomplete testimony." Caldwell v. Gettmann, No. 09 Civ. 580 (DNH) (DEP), 2012 WL 1119869, at *6 (N.D.N.Y. Mar. 2, 2012) (citing Jeffreys, 426 F.3d at 549).

It is well-established that a court "must draw all reasonable inferences in favor of the non-moving party [in summary judgment proceedings, particularly when the non-moving party is pro se], and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. Nonetheless, there are instances when a plaintiff's bald

assertion of a fact without any corroborating evidence does not suffice to create a material issue of fact. See Villalba v. U.S. Att'y Gen., 301 F. App'x 905, 907 n.6 (11th Cir. 2008) (stating that the petitioner's scant evidence that he was entitled to derivative citizenship through his father, which was limited to the petitioner's own claim that that fact was true, was not enough to create a material issue of fact as to the truth of that matter). The Second Circuit has said that

> [w]hile it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

Jeffreys, 426 F.3d at 54 (upholding the district court's grant of summary judgment for the defendants because on the record "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations").

I conclude that a reasonable jury would have to undertake the kind of "suspension of disbelief" that the Jeffreys plaintiff's story would have required in order to find that Plaintiff experienced the alleged attempted shooting as he describes it. Two aspects of the record support my conclusion. First, Plaintiff's deposition testimony regarding the alleged attempted shooting contradicts his earlier account of the event as told to Supervisor Momperousse, and second, there is no external evidence in the record to corroborating Plaintiff's story when, given the nature of the event, many external corroborating facts would likely exist.[32] Cf. Fincher v. Depository

---

[32] I do note that Defendant does not offer a statement from Ms. Hibbert about her alleged lack of involvement in the alleged attempted shooting, which might have been readily available to Defendant.

Trust & Clearing Corp., 604 F.3d 712, 725-26 (2d Cir. 2010) (explaining that a plaintiff's improbable testimony should not be discounted at the summary judgment stage when it relates to a matter for which there would be no external corroborating evidence, i.e., "what the defendant allegedly said or did").

### i. The Plaintiff's Contradictory Accounts of The Incident Raise A Credibility Problem

Although it is a district court's duty in the context of summary judgment to assess the facts presented in a light most favorable to the non-moving party, "when the facts alleged are so contradictory that doubt is cast upon their plausibility," the district court may dismiss the claim. Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (citing Denton v. Hernandez, 504 U.S. 25, 32 (1992)).

"If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 112 (2d Cir. 1998). For example, the Langman Fabrics principle has been applied to forgive when a party's later affidavit contradicts an earlier deposition due to the fact that "the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition." Palazzo v. Corio, 232 F.3d, 38, 43 (2d Cir. 2000). Stated differently, "a material issue of fact may be revealed by [a party's] subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, especially where the party was not asked sufficiently precise questions to elicit the amplification or explanation." Langman Fabrics, 160 F.3d at 112.

Here, Plaintifff's accounts of the attempted shooting suffer from the kinds of inconsistencies discussed in Pico. On June 17, 2011, the day after the alleged event, Plaintiff

told Supervisor Momperousse about the incident, and she recounted the conversation in an email.

Docket No. 41-9.  In this account, according to Supervisor Momperousse, Plaintiff told her that during his lunch hour on June 16, 2011, he was

> standing at the bus stop [when] a group of bandits walk[ed] towards him with their hands in their pockets.  [Plaintiff] stated he then took out his cell phone and they ran away.  He then heard gun shots.  According to [Plaintiff] this occurred near [Denise Hibbert's] house.

Id.[33]

Then, on May 3, 2013, Plaintiff testified at deposition about the alleged attempted shooting and described it as follows:

> I [left] for lunch, and on my way back to work [while I was on] Beach 47th Street, a group of bandits . . . walked toward me with . . . a cane on hand, and they were across [the street from Denise Hibbert's house].  Across her house those bandits leaned on a car. [I was walking in their direction] and when I [got] closer they start[ed] walking to meet with me.
>
> When I realized that they [had] mean face[s], I grabbed my cell phone . . . just in case I need[ed] to call [the] police.  And then as soon as I grab[bed] my phone they [shot] gunshot[s], pop pop pop, then I was scared and turned [and took a roundabout way back] to my office.
>
> Before I [got] to the office, I saw a police SUV.  I sign[aled], I wave[d], and the cops stop[ped and] asked me what happened.  I said, "A group of bandits open[ed] fire while I walked toward my office."  And then the cop[s] turned straight back [and went to the place] across from [Denise Hibbert's house] where the bandits were, and [the bandits] were surrounded.

Docket No. 47-1 at 58-59.[34]  Later in the same deposition, Plaintiff provided additional detail about the alleged attempted shooting, testifying that five to ten African-American men made up

---

[33] Plaintiff also told this version of events to HR Director Tolle during her investigation at the time.  Docket No. 41-10.

[34] In addition, Plaintiff told this version of events in his comments on his July 2011 Performance Correction Notice.  Docket No. 41-12.

the group of bandits, and that every single one of them was holding a cane as they walked towards him from Denise Hibbert's house. Id. at 229-31. According to Plaintiff, the men were approximately sixteen feet (five meters) away from him when they fired two or three gun shots. Id. at 232-34. Plaintiff explained that he never saw a gun but that he knew that the group of men shot at him because the gun shots were fired at the exact same moment Plaintiff pulled his cell phone out. Id. at 236. Plaintiff testified that he ran away in fear because the group of men were trying to kill him, and that a nearby female pedestrian ran, too, but that the men did not give chase. Id. at 235-36.

The differences between Plaintiff's two descriptions of the June 16, 2011 incident are obvious, but I will catalog them nonetheless. First, on June 17, 2011, Plaintiff told Supervisor Momperousse that he was standing at the bus stop as the men approached him, whereas on May 3, 2013, Plaintiff testified that he was walking towards the men as they walked towards him. Compare Docket No. 41-9, with Docket No. 47-1. Next, on June 17, 2011, Plaintiff told Supervisor Momperousse that the men had their hands in their pockets as they walked towards him, whereas on May 3, 2013, Plaintiff testified that every one of the five to ten men was holding a cane as they approached him. Compare Docket No. 41-9, with Docket No. 47-1. Third, on June 17, 2011, Plaintiff told Supervisor Momperousse that the men ran away once Plaintiff pulled out his cell phone and then Plaintiff heard gun shots, whereas on May 3, 2013, Plaintiff testified that the men opened fire when he pulled out his cell phone and then Plaintiff ran away. Compare Docket No. 41-9, with Docket No. 47-1.

Here, Plaintiff's conflicting accounts of the alleged attempted shooting raises credibility issues of such magnitude that no jury could find that the shooting occurred. The Pico Court noted that "[f]rom the complaint, to plaintiff's deposition, to his opposition papers to [the]

defendants' summary judgment motion, [the plaintiff's allegations of the events at issue are replete with inconsistent and contradictory statements." Pico, 994 F. Supp. at 470. The same is true in this action, where Plaintiff's May 3, 2013 deposition testimony about the attempted shooting diverges in at least three significant ways from his June 17, 2011 description of the attempted shooting to Supervisor Momperousse: (1) Plaintiff's position as the five to ten men walked toward him; (2) the degree to which the five to ten men were armed; and (3) the certainty that the men were shooting at Plaintiff specifically. Compare Docket No. 47-1, with Docket No. 41-9; see McMahon v. Fura, No. 10 Civ. 1063 (GHL), 2011 WL 6739517, at *10 (N.D.N.Y. Dec. 23, 2011) (granting summary judgment for the defendant in an excessive force case because the plaintiff's initial testimony that "it felt like he was being electrocuted . . . [s]o I must have been tased" and later testimony that he believed he had been tased "because his whole body shut down" was too incomplete to permit a jury to find in the plaintiff's favor). It should be noted that in two out of these three differences, the account that Plaintiff provided once he had filed this action was much more harrowing than his original version of the attempted shooting (I view the change in Plaintiff's position as neutral in terms of the gravity of the moment, although it still impeaches his credibility). See Kregler v. City of N.Y., 821 F. Supp. 2d 651, 659 (S.D.N.Y. 2011) (granting summary judgment to individuals defendants when the plaintiff's conflicting testimony offered two different versions of who was liable for an adverse employment action against him, stating that the plaintiff "cannot have it both ways").

Furthermore, the nature of the contradictions are not the sort of mere ambiguities or incompleteness that Langman Fabrics viewed as forgiveable. See Langman Fabrics, 160 F.3d at 112 (excusing the plaintiff's conflicting statements, finding it attributable in part to the fact that the later testimony was "far more detailed than the first"). As my above comparison of

Plaintiff's description of the shooting shows, the inconsistencies are not the result of one version being more detailed than the other; instead, Plaintiff describes important aspects of the incident in completely different ways.

### ii. The Record's Lack Of Corroborating External Evidence

"Although credibility assessments are improper on a motion for summary judgment," a court may be justified in dismissing a claim when the "plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful." Pulliam v. Lilly, No. 07 Civ. 1243 (SJF) (AKT), 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010) (citing Jeffreys, 426 F.3d at 554). In Pulliam, the Court granted summary judgment for the defendants on the plaintiff's excessive force claim because the plaintiff's inconsistent testimony about what happened and his injuries was aggravated by the fact that "there [was] no evidence in the record that [the] plaintiff ever notified the county or [the] defendants of his complaints of excessive force prior to the initiation of this lawsuit, several months after his arrest." Pulliam, 2010 WL 935383, at *5.

Here, Plaintiff has provided no external evidence in an effort to rehabilitate the fact that his contradictory testimony about the alleged attempted shooting means that a reasonable jury could not plausibly find that it occurred. Docket No. 47-1. Plaintiff's omission in this regard is a problem because if Plaintiff's testimony is to be credited, external corroborating evidence certainly exists due to the fact that he flagged down some police officers after the shooting, who then surrounded the five to ten men at Denise Hibbert's home. Id. at 58-59. Plaintiff also testified that he filled out a police report about the incident. Id. at 238.

In light of the foregoing, Plaintiff's statements about police involvement inject more questions than answers into the case, as the record does not contain a copy of the police report or other information about a police investigation or prosecution of Plaintiff's assailants. The record

is also silent as to whether Ms. Hibbert was ever investigated by the police for the crime or whether Plaintiff considered pressing charges in connection with the events.[35]  It is curious that there is no information in this case's record about such a frightening and extremely public crime other than Plaintiff's allegation that it occurred.  See Ethelberth v. Choice Sec. Co., -- F. Supp. 3d --, No. 12 Civ. 4856 (PKC), 2015 WL 861756, at *10 (E.D.N.Y. Feb. 27, 2015) (granting summary judgment for the defendants on the plaintiff's FLSA claim because the plaintiff's reliance on his individual testimony that the defendants engaged in interstate commerce did not establish a genuine issue of material fact when the plaintiff had access to discoverable external evidence on the subject).

### iii.  Conclusion

In light of the foregoing, Plaintiff's evidence about the June 16, 2011 alleged attempted shooting does not raise a genuine issue of fact for a jury to decide.  There is no evidence that Ms. Hibbert or any other employee was connected to the event; the event occurred off-site while Plaintiff was not engaged in work-related duties and there is no other specific basis to impute the event to Defendant; and Plaintiff's evidence of the event relies upon his own inconsistent statements and no external evidence despite the fact that external evidence is likely to exist.

### 3.  The Totality Of The Circumstances Do Not Support A Finding That The Alleged Offending Conduct Created A Hostile Work Environment

Additionally, I have conducted a totality-of-the-circumstances review of the other alleged incidents supporting Plaintiff's hostile work environment claims, and I find that they did not collectively or individually create a workplace "so severely permeated with discriminatory

---

[35] Instead, the record shows that on July 17, 2011, Plaintiff discussed Ms. Hibbert's alleged involvement in the alleged attempted shooting during the same meeting in which he complained about Ms. Hibbert using disinfecting wipes on the telephone, making personal calls during the work day, and demanding that Plaintiff not speak to her family.

intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." Desardouin, 708 F.3d at 105 (citation omitted); see Kassner, 496 F.3d at 240.[36]

### (1) The Totality-Of-The-Circumstances Analysis

#### i. First Factor: Frequency

First, the incidents which allegedly comprise the hostile work environment were not sufficiently frequent to permit a jury to plausibly find that they so severely permeated the work environment with intimidation, insult and ridicule as to alter the terms and conditions of Plaintiff's employment. The incidents happened on five occasions over the course of roughly fourteen months (September 2010; June 15, 2011; August 12, 2011; October 12, 2011; and November 9, 2011), a rate of occurrence which courts have found to be infrequent. See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."); Pasic v. Eztzi's Texas Holding Corp., No. 01 Civ. 1114 (AGS), 2002 WL 31938854, at *3 (S.D.N.Y. Jan. 9, 2002) (granting summary judgment for the defendant because "five comments over the course

---

[36] In his February 28, 2014 letter to the Court, Plaintiff for the first time made an allegation about Ms. Nelson, another SCM who shared an office with Plaintiff, Ms. Hibbert and Mr. Miller. Docket No. 31. According to Plaintiff, Ms. Nelson began "as a God's girl," but "turned to the girl of the devil" and "started attacking [him] silently using nuisance." Id. Plaintiff makes a single specific allegation against Ms. Nelson which is that, one day, her office chair rolled against another office chair, which then bumped up against Plaintiff's chair. Id. Plaintiff moved the middle chair away, and Ms. Nelson "asked [him] if [he] need[ed] more space." Id. Plaintiff "avoid[ed] answering her question" at the time because they were alone in the office, but later he reported the incident to Supervisor Momperousse. Id. When Supervisor Momperousse witnessed a similar chair bump later on, she told Plaintiff that it was an accident. Id. In Plaintiff's February 28, 2014, he tells the Court that security surveillance tapes will prove that the chair bump was no accident. Id. However, other than Plaintiff's allegation there is no evidence in the record about Ms. Nelson's chair bumping a chair which then bumped into Plaintiff's chair. I accordingly do not consider the incident in the hostile-work-environment analysis.

of thirteen months of employment . . . are insufficient to establish that [the plaintiff] suffered the kind of pervasive harassment necessary to pursue a hostile work environment claim"); <u>Lucas v. South Nassau Communities Hosp.</u>, 54 F. Supp. 2d 141, 148-49 (E.D.N.Y. 1998) ("[T]he isolated specific incidents do not establish a pervasive hostile work environment.  This is not an instance where the plaintiff alleges a continuous course of harassing conduct with only specific recall of a few episodes, rather, the plaintiff alleged a handful of indeterminate encounters with a few explicit events."); <u>Lamar v. Nynex Serv. Co.</u>, 891 F. Supp. 184, 185 (S.D.N.Y. 1995) (granting summary judgment for defendant on the plaintiff's sex-based hostile work environment claim because "five incidents of an allegedly sexual nature over the course of approximately seventeen months . . . were too sporadic to constitute sexual harassment as a matter of law"); <u>cf.</u> <u>Vazquez v. Southside United Hous. Dev. Fund Corp.</u>, No. 06 Civ. 5997 (NGG) (LB), 2009 WL 2596490, at *14 (E.D.N.Y. Aug. 21, 2009) (finding a hostile work environment where plaintiff was harassed "almost every day" with offensive age-related comments).

It is true that Plaintiff testified that Ms. Hibbert disinfected the telephone on more than just the one occasion (June 15, 2011).  Even if I were to assume that a reasonable jury could find that sanitizing shared work space is abusive without showing a related connection to unlawful discrimination (which I do not), Plaintiff's evidence about its regularity is too vague.  In <u>Almontaser v. New York City Department of Education</u>, No. 13 Civ. 5621 (ILG) (VMS), 2014 WL 3110019, at *7, the court dismissed the plaintiff's age-based hostile work environment claim which was based, in part, on the "simply too vague" allegation that the principal of the school where he worked "frequently" told him that he was too old and asked when he was going to retire.  In this respect, Plaintiff's allegations here similarly fail to establish sufficient frequency such that the first factor weighs against a hostile work environment finding.

### ii. Second Factor: Severity

Next, a reasonable jury could not find the alleged incidents severe because they are typical office disputes or unfortunate stray remarks that could not be plausibly described as severe. "[P]ersonality conflicts at work that generate antipathy and snubbing by . . . co-workers are not actionable . . . ." Burlington N., 548 U.S. at 68 (internal quotations omitted).

For example, I find trivial the June 15, 2011 phone disinfectant issue; the June 15, 2011 telephone dispute; the June 15, 2011 family-conversation remark; the August 12, 2011 telephone dispute; the August 12, 2011 client-sister dispute; the October 12, 2011 paper-shredder dispute; and the November 9, 2011 hole-punch litter dispute. These incidents are not severe by any stretch of the imagination, instead representing petty office grievances. See Pezzano v. Sears, Roebuck & Co., 131 F.3d 131, 131 (2d Cir. 1997) (stating that the male sex-and age-discrimination plaintiff's complaints that his female co-workers complained about him eating his lunch at work, threw away his papers, and gave him undesirable sales leads were "petty annoyances" that "do not rise to the level of a hostile work environment" as a matter of law because "no reasonable jury would have found for [the plaintiff] on this claim"); Marcus v. Barilla Am. N.Y., Inc., 14 F. Supp. 3d 108, 119 (W.D.N.Y. 2014) (stating that the plaintiff's complaint that, inter alia, she had to meet with her boss to discuss how to improve her interpersonal relationships at work "amounts to nothing more than workplace dynamics—that is, personal enmity or personality conflicts, and not a hostile work environment"); Clarke v. InterContinental Hotels Grp., PLC, No. 12 Civ. 2671 (JPO), 2013 WL 2358596, at *10 (S.D.N.Y. May 30, 2013) (stating that the plaintiff's allegations that her supervisors snubbed her, spoke to her rudely about her work ethic, excessively scrutinized her work, and gave her more work to do than other employees "do not plausibly point to a work environment that is

sufficiently abusive to constitute a hostile workplace"); Davis-Molinia v. Port Auth. of N.Y. & N.J., No. 08 Civ. 7584 (GBD), 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (finding that the plaintiff's allegations that her supervisors yelled at and talked down to her, excluded her from gatherings, and did not encourage coworkers to assist her, are insufficient to establish a claim for hostile work environment).

The September 2010 "old Haitian" insult and contemporaneous excursion exclusion are not severe as a matter of law, either. One-off comments like these, if made, are regrettable, but as "stray remarks," they are not severe and do not support a hostile work environment. For example, in De la Cruz v. City of N.Y., 783 F. Supp. 2d 622, 644 (S.D.N.Y. 2011), the Southern District of New York dismissed the plaintiff's ADEA hostile work environment claim on summary judgment because the defendant's "stray remarks regarding [the plaintiff's] seniority and physical fitness (or lack thereof)" were not actionable. See Rivera, 28 F. Supp. 3d at 163 (dismissing the plaintiff's hostile work environment claim based upon his Puerto Rico origin because "[t]here is only one remark that referenced [the plaintiff's] ethnic origin in the entirety of his hostile work environment allegations," making it "the classic 'stray remark' which, standing alone, will not support a . . . hostile work environment claim").

A reasonable jury also could not plausibly find Ms. Hibbert's alleged June 15, 2011 remark that "[w]e are going to shoot you out of here" to be so severe that it would infuse the workplace with sufficient intimidation to alter the terms and conditions of Plaintiff's employment. Plaintiff testified that he viewed this remark as having multiple interpretations until he experienced the alleged attempted shooting but, as I discussed above, Plaintiff offered insufficient admissible evidence about the event to factor it as a workplace event contributing to a hostile work environment. In light of the foregoing, my view that a reasonably jury could not

find Ms. Hibbert's remark severe is based on the fact that without Plaintiff's accompanying unsubstantiated story about the alleged attempted shooting the remark could not alone have infused Plaintiff's work environment with so much intimidation that it altered the terms and conditions of his employment.

### iii.   Third Factor: Physical Threat Or Humiliation

As just discussed, I find that the alleged incidents could not plausibly be found severe because they constituted unremarkable workplace disputes and unfortunate stray remarks.  For the same reasons, I find that it is obvious that there is no genuine issue of material fact as to whether they were physically threatening.

I also find that these incidents present no genuine issue of material fact as to whether they were objectively humiliating.  The September 2010 "old Haitian" insult and excursion exclusion were isolated offensive utterances, which do not satisfy this factor.  Rivera, 28 F. Supp. 3d at 163; De la Cruz, 783 F. Supp. 2d at 644.  As for the rest of the incidents, a reasonable jury could not plausibly recognize them as objectively humiliating.  As I discussed above, the record does not allow a finding that any of the events occurred due to Plaintiff's national origin or age, and so they are nothing more than the kind of universally annoying behaviors that many American workers endure from their colleagues from time to time.  A recitation of these incidents serves as a reminder of this: Plaintiff accuses Ms. Hibbert of obsessively using Purell, making audible personal telephone calls, meddling with his client, leaving her bag to occupy a shared space and failing to clean hole-punch litter.  See Missick, 707 F. Supp. 2d at 355 (granting an employer's motion for summary judgment on the plaintiff's hostile work environment claim because, inter alia, although individuals at the school where the plaintiff was employed "may have referred to her without due regard . . . , curtly summoned her over the intercom, or otherwise acted in a

discourteous manner, a pattern of simple discourtesy, without more, has consistently been held insufficient to trigger hostile work environment protections under . . . federal law"); Waldo, 2009 WL 2777003, at *16-17 (granting an employer's motion for summary judgment on the plaintiff's national-origin-based and gender-based hostile work environment claim because the plaintiff's "disputes and altercations with various supervisors," "disapproval of his supervisors' work habits," and allegations that he was called names, denied work supplies, ignored and threatened by a co-worker, were "not sufficiently severe and pervasive"). As a point of comparison, courts historically find only more demeaning situations to present triable humiliation, for example, a supervisor's frequent solicitation of sexual relations with the plaintiff, who was his subordinate, Desardouin, 708 F.3d at 105-06; a supervisor's frequent and harsh criticism of the plaintiff, who was his subordinate, in public places where he would call her a "bitch" and "stupid" in front of a large audience, Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 116 (2d Cir. 2010); or a white supervisor constantly refusing to speak to or salute an African-American corrections officer plaintiff but making a point to always salute white officers in front of the plaintiff, Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 229-30 (2d Cir. 2004). Again, Title VII and the ADEA are not general civility codes. See Burlington N., 548 U.S. at 68 (making this statement with respect to Title VII); Almontaser, 2014 WL 3110019, at *8 (applying the principle to the ADEA).

### iv. Fourth Factor: Unreasonable Interference With Plaintiff's Work Performance

Fourth, a reasonable jury could not interpret this record to show that the alleged incidents interfered unreasonably with Plaintiff's work performance. In Wesley-Dickson v. Warwick Valley Central School District, 973 F. Supp. 2d 386, 407 (S.D.N.Y. 2013), aff'd by 586 F. App'x 739, 745 (2d Cir. 2014), the Southern District of New York dismissed the plaintiff's hostile-

work-environment claim on summary judgment after conducting the totality-of-the-circumstances analysis. In affirming, the Second Circuit pointed to a relationship between the frequency and severity factors of the hostile work environment totality-of-the-circumstances test: "Like the district court, we conclude that the [insensitive] statements attributed to [the] defendants were too infrequent and insufficiently severe to interfere unreasonably with [the] plaintiff's work performance." Wesley-Dickson, 586 F. App'x at 745. Similarly, as I have found here that the incidents were, objectively speaking, infrequent, not severe, not physically threatening and not humiliating, I find that the incidents could not be objectively viewed as unreasonably interfering with Plaintiff's work performance, either.

It is also important to note that Plaintiff testified that the alleged incidents did not affect his work performance because his annual performance reviews from 2010, 2011 and 2012 were "good/great" and that his supervisors had had to invent any less-than-perfect marks because, had they been honest about Plaintiff's flawless work performance, the reports would not have been believable to someone outside the department. Docket No. 47-1 at 166, 174; Docket No. 41-6; Docket No. 41-7; Docket No. 41-8. In Shepherd v. BCBG Max Azria Group, Inc., No. 11 Civ. 7634 (RJS) (AJP), 2012 WL 4832883, at *22 (S.D.N.Y. Oct. 11, 2012), adopted by Shepherd v. Azria, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012), the Southern District of New York dismissed the plaintiff's race-based hostile work environment claim on summary judgment because, inter alia, the plaintiff had stated that "she outperformed her colleagues." According to the Shepherd Court, this amounted to a concession that the conduct at issue did not interfere with her ability to work. Id. Here, Plaintiff's testimony similarly establishes that the complained-of incidents did not interfere with his work performance.

I also note that Defendant's July 2011 offer to explore a promotion for Plaintiff to ICM is

uncontradicted evidence that Plaintiff's job performance had not materially suffered because otherwise, it would not have been reasonable for Defendant to consider giving him more responsibility and pay. Docket No. 41-14.[37]

### v. Fifth Factor: Whether The Alleged Incidents Were Subjectively Hostile

Finally, as Plaintiff testified that he has suffered emotional distress since 2010 as a result of all of the incidents at issue in this action, I find that a genuine issue of material fact does exist as to whether the alleged incidents affected Plaintiff's psychological well-being. Docket No. 47-1.

### vi. Conclusion

Looking at the five factors of the totality-of-the-circumstances test together, Plaintiff's Title VII national origin and ADEA hostile work environment claims must be dismissed because the alleged incidents, even if a reasonably jury found them to have occurred as Plaintiff describes, do not plausibly constitute a hostile work environment. A reasonable jury could not find that the incidents in question: (1) were frequent (they occurred on five dates over the course of roughly one year); (2) were collectively or individually severe; (3) were physically threatening or humiliating; or (4) unreasonably interfered with Plaintiff's work performance. As these factors all weigh against a reasonable jury plausibly finding that the series of alleged incidents amounted to a hostile work environment, the record could not support such a finding as a matter of law. It is true that an issue of fact exists as to whether Plaintiff subjectively believed he experienced a hostile work environment, but Plaintiff has failed to make the necessary objective showing. See Faragher v. City of Boca Raton, 524 U.S. 75, 788 (1998) ("[S]imple teasing, . . .

---

[37] I recognize that not all of Plaintiff's performance evaluations were issued after the alleged incidents, and that some of the alleged incidents occurred after the July 2011 offer to explore the ICM promotion as well.

offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment.'"); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) ("Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' . . . [and g]enerally, 'incidents must be more than episodic[].'"); Raum v. Laidlaw Ltd., 173 F.3d 845, 845 (2d Cir. 1999) (affirming the district court's FRCP 12(b)(6) dismissal of the plaintiff's sex-based Title VII hostile work environment claims because the plaintiff's supervisor's "obscene gestures and comments" may have been offensive, but the allegations did not suggest that the workplace was permeated with discriminatory intimidation or that the conditions of the plaintiff's employment were adversely affected); De la Peña v Metro. Life Ins. Co., 953 F. Supp. 2d 393, 416-17 (E.D.N.Y. 2013) (dismissing the plaintiff's hostile work environment claim based on race, color and national origin because the employer's requirement that the employee return to work too soon after an injury, the manager's offensive comment about Filipinos, and the manager's disrespectful conduct toward the employee which included a non-sexual physical touching, were not sufficiently severe or pervasive to qualify).

### ii. Additional Problems With Plaintiff's Discrimination Claims

A plaintiff alleging a Title VII or ADEA claim based upon an employer's discrete discriminatory act or acts must prove that (1) he belonged to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Mathirampuzka v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); see Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). As I have discussed above, Plaintiff

fails to meet the prima facie element of inference of discrimination and as a result, I granted Defendant's summary judgment motion and ordered the entry of judgment for Defendant on that basis. See Section III.b.ii.2., supra.

As I noted in the hostile work environment context, even assuming, arguendo, that Plaintiff's discrimination claims did not suffer this fatal flaw, they would fail for a different reason, which is that the record does not allege any actionable adverse employment action. In Patrolmen's Benevolent Association of the City of New York v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002), the Second Circuit held that in a Title VII discrimination action, an adverse employment action must materially affect a plaintiff's employment to be actionable, and "a materially adverse change must be more disruptive than a mere inconvenience or an alteration of job responsibilities." This materiality "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminishes material responsibilities, or other indices . . . unique to a particular situation." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

Here, Plaintiff suffered nothing remotely on par with the aforementioned events. Plaintiff continues to work for Defendant; was asked whether he would like management to explore a promotion which would have afforded him a more distinguished title (ICM) and related salary increase (Plaintiff declined the offer); received scheduled bi-annual salary increases for his SCM work in 2011 and 2013; and received performance-based and holiday bonuses in 2011, 2012 and 2013. In sum, the record shows that Plaintiff's position has remained stable during all relevant periods, that Plaintiff's compensation has improved during all relevant periods and that Plaintiff was even given an opportunity during the time in question to explore improving his position and to further increase his compensation.

It is difficult, then, to discern what Plaintiff believes was the materially adverse action or actions which provide the foundation for his Title VII and ADEA discrimination claims. As Plaintiff has not made his position in this regard clear, I have gathered the adverse-employment-action theories I can identify from Plaintiff's Complaint, letters to the Court, deposition transcript and conferences with the Court. Docket Nos. 1, 31, 44, 47-1.[38] None of these has merit.

First, Plaintiff received a salary increase in 2011 on celebrating two years working for Defendant. Plaintiff argues that Defendant should have made that salary increase retroactive to his March 23, 2009 start date as opposed to March 23, 2011, the date of his work anniversary. Docket No. 1 at 5-6.

Plaintiff's argument that Defendant should have applied his salary increase retroactively back to his start date has no support in the record. Plaintiff testified that his belief that he is

---

[38] In Plaintiff's July 10, 2014 response in opposition to Defendant's summary judgment motion, he alleges for the first time that on June 18, 2014, he asked Defendant for a sick day because his wife was sick that particular day (with an undescribed illness), and he wanted to stay home to tend to her. Docket No. 44. Defendant told Plaintiff that he would have to take a vacation day to tend to his wife that day, which Plaintiff did. Id. According to Plaintiff, his dispute with Defendant over the vacation day caused Defendant to change its family medical leave policy on July 1, 2014, in order to offer more protections to workers in compliance with "the federal family act." Id. Due to Plaintiff's allusion to the "federal family act," I understand him to say that the Federal Medical Leave Act ("FMLA") did not require him to take the vacation day. Id. Defendant replied with an affidavit from VPO Holman explaining that Defendant's July 1, 2014 medical-leave policy amendment was not a response to Plaintiff's complaint about having to take a vacation day, but that it reflected New York City's enactment of the Earned Sick Time Act ("ESTA"), see N.Y.C. Admin. Code § 20-911, et. seq., which permitted employees to use their earned and unused sick days to care for certain family members, and which by its terms became effective July 1, 2014. Docket No. 45 ¶¶ 5-6. Assuming, arguendo, that Defendant violated the FMLA or ESTA vis-à-vis its response to Plaintiff's request for one sick day, Plaintiff does not allege that Defendant responded differently to such requests when they were made by non-Haitian employees or younger employees. Docket No. 44. Instead, Plaintiff frames the problem exclusively as a medical-leave problem. Id. at 3. As a result, I will not discuss this allegation further in this Memorandum and Order discussing Plaintiff's lawsuit containing discrimination and retaliation claims.

entitled to this money is based on a form that CM Director Wefers gave him at some point stating that Defendant gives salary increases that apply retroactively to an employee's start date. Docket No. 47-1 at 123-25. Plaintiff's testimony further clarified that this was how he remembered the form, but conceded that "[t]here [is] a possibility that [he] misunderstood it" (although he did not think that was likely). Id. at 129. Plaintiff testified that he "ha[d] a copy [of the form] still at home," Defendant made a request that Plaintiff produce it in discovery, and Plaintiff agreed that he would provide a "a copy of the [form]." Id. at 123-25. Despite the uncertainty surrounding the form and Plaintiff's admission that he may have misunderstood it, Plaintiff has never entered the form in evidence to support his claim that he had an entitlement to retroactive pay. Id. at 124-25. I discount, under the best evidence rule, Plaintiff's testimony as to the contents of [the form] that [he] testified about but did not produce." MC. v. GC, 25 Misc.3d 217, 219 (N.Y. Sup. 2009); see Fed. R. Evid. 1002 (requiring generally that "[t]o prove the content of a writing . . . the original . . . is required"); Bouzo v. Citibank, N.A., 96 F.3d 51, 60 (2d Cir. 1996) (upholding an adverse inference against the plaintiff "as a result of his nonproduction of documents that he had undertaken to produce in the course of his [first] deposition testimony" but which he could not recall or testified were destroyed when deposed a second time); DiCristi v. Liberty Mut. Ins. Co., 8 Misc.3d 1027 (A), at *2 (N.Y. Sup. 2005) ("Without the insurance contract itself, any recitation of the contract's terms through testimony or other documents in evidence is rank hearsay and contrary to the best evidence rule.").

Plaintiff also testified that if it turned out that Defendant did not apply all employees' salary increases retroactively to their start dates, the issue "is something [he] can forget." Docket No. 47-1 at 139. Defendant has submitted an affidavit from VPO Holman testifying that the company's practice and policy with respect to its non-union employees is not to apply an

automatic work-anniversary salary increase retroactively to the employee's start date.  Docket No. 41-3 ¶ 44-48.  Defendant has also submitted in evidence an administrative Human Resources form dated April 2011 which was filled out by CM Director Wefers to document Plaintiff's salary increase, which lists its "effective date" as March 23, 2011.  Docket No. 41-20; Docket No. 47-1 at 136-37.

In light of the foregoing, Plaintiff has failed to present any admissible evidence to support it whereas Defendant has presented evidence to disprove it; thus, there is no material fact in dispute for the fact finder to decide.  Even if Plaintiff had not represented that he would abandon his claim under such circumstances, on this record the failure to apply the salary increase retroactively is mere compliance with company policy, which is not an adverse employment action.  See La Marco v. N.Y.S. Nurses Ass'n, 118 F. Supp. 2d 310, 320 (N.D.N.Y. 2000) (noting that compliance with a company policy does not constitute an adverse employment action).

Another possibility is that Plaintiff believes that Defendant's July 7, 2011 issuance of a Performance Correction Notice against him is an adverse employment action.  Docket No. 41-12. However, courts have consistently held that a "single [disciplinary report] does not constitute an adverse employment action as a matter of law."  Tuccio v. U.S. Sec. Assoc., Inc., No. 10 Civ. 1714 (JFB) (GRB), 2013 WL 1121356, at *7 (E.D.N.Y. Feb. 27, 2013); see Blake v. Potter, No. 03 Civ. 7733 (LAP), 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007) ("Courts in this District and elsewhere have held that a single letter or warning from an employer, without any subsequence adverse consequence, is not an adverse employment action.") (quotation omitted), aff'd, 330 F. App'x 232 (2d Cir. 2000).[39]  Plaintiff testified that the Performance Correction

---

[39] It should be noted that Defendant issued an identical Performance Correction Notice to Ms.

Notice was not accompanied by any such action, i.e., he was not terminated, suspended, demoted, or docked pay.  Docket No. 47-1 at 195.[40]

Another Plaintiff argument which arguably alleges material adversity is his complaint that

> the agency's managers create[d] confusion over documentation
> such [that] the supervisor told me [that I would] have to do [client]
> progress notes over again because they are not suppose[d] to be
> related to the clients' goals.  [One month later], she told me [the
> opposite, that] the notes [were] supposed to be related to the goals.

Docket No. 1 at 5-6.  Plaintiff's testimony appears to explain these client notes as documentation of his twice-a-month meetings with his clients and, according to Plaintiff, it takes him approximately ten minutes to write a progress note.  Docket No. 47-1 at 163, 165.  As Plaintiff has had anywhere from twenty-eight to forty-eight clients, this means that Plaintiff would have had to rewrite at most ninety-six client notes for the month in question which, by his estimation, would have taken him approximately three workdays to complete.  Id.; Docket No. 49-1 (stating that Plaintiff presently has forty eight clients).

Then, on March 20, 2015, Plaintiff filed a document with the Court which I view as related to the progress-note issue, showing that Supervisor Momperousse sent him a memo in early March 2015 stating that she had reviewed Plaintiff's client files and found that thirty-three out of forty-eight were missing required forms.  Docket No. 49-1.  Supervisor Momperousse's

---

Hibbert arising from the same incident such that a claim of disparate treatment would be difficult to make.

[40] Plaintiff testified that his June 2012 performance bonus was smaller than his co-workers' bonuses, but he offers no proof of that fact other than to say that his co-workers told him that they received larger bonuses.  Docket No. 47-1 at 167.  This is inadmissible hearsay introduced for the truth of the matter asserted.  Furthermore, Plaintiff testified that every employee's performance bonus was discretionary and tied to their performance evaluation.  Id. at 295.  Relevant evidence to determine whether this amounts to an adverse employment action would therefore require not just documentation of the comparator employees' bonuses but also the performance evaluations which justified those bonuses.  None of this is in the record.

memo instructed Plaintiff that she was granting him twelve working days to get the client files in order.  Id.

According to Plaintiff, Supervisor Momperousse's March 20, 2015 memo is "sabotage," explaining that his forty-eight clients are many more than the thirty for which he is usually responsible.  Id.  Plaintiff alleges that Defendant has therefore inappropriately raised his workload without also giving him a raise.  Id.  Plaintiff suggests that if Defendant would pay him to come in on Saturday, that would compensate him for the extra work.  Id.  This argument may be related to Plaintiff's complaints elsewhere that he has "low turnout of production due to chronic stress" occasioned by the unlawful discrimination, harassment and retaliation he has suffered.  Docket No. 31 at 4.[41]  Taking all of these claims together, Plaintiff's argument effectively appears to be that Defendant gives him too much work that he cannot complete, which I understand as a claim that Defendant's adverse employment action against Plaintiff is to subject him to overwork given his current salary.[42]

Although it is conceivable that particularly severe overwork could constitute a materially adverse employment action, for example, if an employer set an employee up to fail in order to concoct a justification to fire him or her so that the employer could hide that the termination was actually motivated by the employee's race, religion, sex, national origin, disability, age or membership in another class of persons protected under anti-employment discrimination law,

[41] Plaintiff's claim that he underperforms due to stress may also be his way of anticipating and responding to a defense argument that, if the Court finds an adverse employment action, it is because of Plaintiff's poor work performance.  As I do not find that Plaintiff has suffered any adverse employment action in this case, I do not reach that question.

[42] It should be noted that Plaintiff testified that there came a time in 2013 when CMVP McGovern and Supervisor Momperousse approached Plaintiff and said that they wanted all SCMs (Mr. Miller and Ms. Nelson included) to increase their caseloads.  Docket No. 47-1 at 153-54, 161.  Again, the fact that Plaintiff complains about Defendant acts that he admits are also applied against his co-workers, this record demonstrates no disparate treatment on any of the protected bases claimed by Plaintiff.

Plaintiff presents no evidence here that even vaguely suggests that Defendant is engaging in these kinds of manipulations. See Warner v. Vance-Cooks, 956 F. Supp. 2d 129, 170 (D.D.C. 2013) (finding that the fact that employees face overwork due to vacant positions does not constitute a materially adverse employment action for the purposes of Title VII discrimination claim); Ellis v. Compass Grp. USA, Inc., No. 08 Civ. 366 (KFG), 2010 WL 4792668, at *6 (E.D. Tex. Oct. 18, 2010) (stating that the plaintiff's argument that she was "routinely overworked or required to handle a heavier workload" than others could not constitute an adverse employment action); King v. Salazar, Nos. 05 Civ. 0575 (JB) (WDS), 05 Civ. 0997 (JB) (WDS), 2009 WL 1300740, at *6 (D.N.M. Mar. 2, 2009) (stating that the plaintiff's assumption of additional duties was not an adverse employment action but acknowledging that overwork could be materially adverse under certain conditions). On the contrary, Plaintiff's complaint that he should receive more pay to compensate him for having more assignments is an "employment-related grievance[] amounting to dissatisfaction with his working conditions" that "cannot qualify as [an] adverse employment action[]." Ndondji v. InterPark Inc., 768 F. Supp. 2d 263, 280-81 (D.D.C. 2011) (dismissing the plaintiff's Title VII discrimination claim based in part on the allegation that the defendant "overworked him"); Goodum v. White, No. 03 Civ. 3257 (JN), 2006 WL 566469, at *19 (N.D. Ill. Mar. 3, 2006) (holding that a "simple increase" in workload is not enough to show an adverse employment action).

Next, Plaintiff implies that as a result of his and Ms. Hibbert's long-term conflict, Supervisor Momperousse's evaluation of his performance was an adverse employment action because it was not fair and proves that it is her "dream to see [Plaintiff] wrongly fired." Docket Nos. 41-7, 44.[43] Even if I were to assume for the sake of argument that Defendant failed to

---

[43] Plaintiff's discrimination claim that Supervisor Momperousse, who is of Haitian descent, has

adequately referee Plaintiff's disputes with Ms. Hibbert, and that this caused the perpetuation

and escalation of those disputes, the mention of Plaintiff's poor communication with his peers on

Supervisor Momperousse's performance evaluation (or any of the other performance

evaluations) is not an adverse employment action because there were no "accompanying

negative consequences." McGrath v. Thomson Reuters, No. 10 Civ. 4944 (JSR) (JCF), 2012

WL 2119112, at *12 (S.D.N.Y. Apr. 30, 2012). On the contrary, Plaintiff received performance-

based bonuses and salary increases without any interruption. In addition, it is worth noting that,

despite Plaintiff's objections to the performance evaluations, he testified that he viewed his

performance evaluations as "good/great" except for Supervisor Momperousse's May 2012

performance evaluation, which had only "one negative thing" with which he disagreed. Docket

---

this "dream to see [him] wrongly fired" is confusingly without any attempted explanation for
why Plaintiff believes that Supervisor Momperousse's actions towards Plaintiff (setting aside
that none of them qualify as materially adverse), are motivated by a discriminatory animus based
upon Plaintiff's Haitian origin. It is not impossible to impute discriminatory animus based on
Haitian origin to Supervisor Momperousse due to her own Haitian heritage, although courts have
held that it may make such a finding more difficult to reach. See Chuang v. T.W. Wang Inc.,
647 F. Supp. 2d 221, 233 (E.D.N.Y. 2009) ("[W]hile it is clearly possible for one member of a
protected class to discriminate against another, a reasonable factfinder would be hard pressed to
infer that [the employer], at age-sixty-six, developed an age-based animus toward [a [plaintiff]
fourteen years her junior, within four years of hiring him."); see Danzer v. Norden Sys., Inc., 151
F.3d 50, 55 (2d Cir. 1998) ("The proposition that people in a protected category cannot
discriminate against their fellow class members is patently untenable."). In any event, it should
be noted that all of Plaintiff's performance evaluations, and not just Supervisor Momperousse's,
cited his problems working collaboratively, as shown by remarks that: "[Plaintiff] can be more
open to accepting advice from his peers," Docket No. 41-6 (May 2010 performance evaluation
conducted by Supervisor Yoosuf); Plaintiff's communication skills [with his peers] have been . .
. minimal," id.; "[a]t times, there is friction among [Plaintiff] and his co-workers and he has
difficulty resolving the conflict(s) when they arise," Docket No. 41-7 (May 2011 performance
evaluation conducted by CM Director Wefers and Supervisor Momperousse together);
"[Plaintiff] has a difficult time communicating with his peers effectively [and] can also get into
arguments with his co-workers that can affect the tenor of the office," id.; "[Plaintiff] does not . .
. work as a team member with his co-workers," id.; "[Plaintiff] tends to isolate himself from
others at work thus creating tension within the office," id.; and "[Plaintiff] has a difficult time
communicating with his supervisors and peers," Docket No. 41-8 (May 2012 performance
evaluation conducted by Supervisor Momperouse alone).

Plaintiff also appears to characterize CMVP McGovern's July 11, 2011 inquiry as to whether he wanted her to explore the possibility of his transfer to GOE and promotion to ICM with a higher salary as an adverse employment action because he calls it a "demotion." Docket No. 31. Plaintiff believes that CMVP McGovern's offer was a demotion because the promotion and salary raise would have required that he be on probation for six months in the new post. Docket No. 31; Docket No. 41-15. CMVP McGovern's offer to explore the possibility of a promotion and salary raise for Plaintiff is not an adverse employment action for four reasons. First, a promotion to a more important title with an increase in salary is the exact opposite of the quintessential adverse employment actions described by the Second Circuit as addressed by anti-employment discrimination law, i.e., "a less important title" or "a demotion evidenced by a decrease in . . . salary." Raspardo, 770 F.3d at 126. Second, it was company policy that promoted employees are on probation for six months in their new post, Docket No. 41-15, and compliance with company policy is not an adverse employment action, see La Marco, 118 F. Supp. 2d at 320. Third, Plaintiff was shown the company policy during deposition and, when asked if reading it helped him to "understand why [CMVP McGovern] explained to you that if you accepted that promotion you would be required to serve a probationary period?," Plaintiff responded, "Now, after reading this, I understand." Docket No. 47-1 at 247. Finally, even assuming, arguendo, that tying probation to a promotion could under some circumstance be considered adverse, CMVP McGovern took no action against Plaintiff; instead, she asked

---

[44] Plaintiff testified that as a result of the "one negative thing" on his May 2012 performance evaluation, he received less money than other employees in his performance bonus. Docket No. 47-1 at 166. According to Plaintiff, he knew this because "they talk, they talk, they talk." Id. at 167. However, the record has no evidence, other than Plaintiff's allusion to inadmissible hearsay, that there was any disparate treatment.

Plaintiff if he wanted to explore promotion to a more important title and an increase in salary, and Plaintiff made a choice to decline the offer.[45]  See Hill v. Pharmacia & Upjohn Co., 67 F. App'x 277, 281-82 (6th Cir. 2003) (holding that the plaintiff did not suffer an adverse employment action due to his employer's failure to hire him for a particular position because the plaintiff chose to take a different position while the first position was still open); Johnson v. Runyon, 137 F.3d 1081, 1082 (8th Cir. 1998) (holding that the plaintiff did not suffer an adverse employment action on the basis of his employer's failure to hire him for a newly created position because, when his employer told the plaintiff that the employer did not intend to hire the plaintiff for the job, the plaintiff chose to take an early retirement and removed himself from the running altogether); Dove v. United Parcel Serv., Inc., 912 F. Supp. 2d 353, 360 (M.D.N.C. 2012) (finding without merit the plaintiff's complaint that his route assignment in a high-crime area was an adverse employment action because the plaintiff bid for that particular route).

Finally, Plaintiff's Complaint alleges some scheduling issues; for example, on some unknown date, "[CM Director Wefers] came onsite and said [that] everyone [was] suppose[d] to clock in not before 9:00 a.m. and [to] clock out at 5:00 p.m."  Docket No. 1 at 5-6.  However, Plaintiff claims that no one other than he shows up at 9:00 a.m. "and it is okay for management."  Id.  This is not an adverse employment action, either.[46]  Although Plaintiff's allegation of lax enforcement of a policy which he personally takes very seriously can understandably be the

---

[45] Plaintiff declined the offer because he worried that if he were placed on probationary status, Defendant could more easily fire him.  Docket No. 41-14; Docket No. 43 ¶ 49; Docket No. 41-3 ¶ 38.  Whatever Plaintiff's reason for choosing not to pursue the offer, the promotion inquiry was not a demotion because ultimately, Plaintiff's position and the terms and conditions of his employment remained unchanged, and he received pay increases.

[46] Assuming, arguendo, that it is true that Plaintiff faithfully adheres to the 9:00 a.m. to 5:00 p.m. work schedule better than his co-workers, this does not tend to show that management treats him differently than his co-workers (that would require evidence relating to how management has disciplined Plaintiff when he fails to comply with his schedule as compared against relevant information about similarly situated co-worker discipline, which the record does not contain).

source of frustration, CM Director Wefers's requirement that Plaintiff clock in on time and work eight hours not an adverse employment action because reporting for work on time and working a scheduled number of hours does not represent a "materially adverse change[] in the terms and conditions of employment." Millea v. Metro-North Ry. Co., 658 F.3d 154, 163 (2d Cir. 2011). For example, in Walder v. White Plains Board of Education, 738 F. Supp. 2d 483, 498 (S.D.N.Y. 2010), the court dismissed a plaintiff's sex discrimination claim on summary judgment because her allegation that her employer refused to allow her the later start time she requested was not a materially adverse employment action.

Relatedly, Plaintiff's February 28, 2014 letter complains that Defendant has not given him a flexible schedule in order to pursue a master's degree. Docket No. 31. Plaintiff testified that he mentioned his interest in studying for a master's degree in social work to VPO Holman, who was "very open, very nice, very supportive," with the idea that he would do it through a collaboration between Defendant and Hunter College. Docket No. 47-1 at 44. However, Plaintiff testified that when he sent a form to Defendant regarding the plan, he never got a response. Id. at 43. The record contains no further information, although relevant information would include: whether there are eligibility requirements for the program (or whether all employees at all levels of employment are guaranteed participation); whether there are limits to the numbers of employees who may participate in a calendar year (and whether applicants are processed on a first-come, first-serve basis), etc. On the record as it stands, Plaintiff's claim about the master's program as framed does not qualify as an adverse employment action because it does not address whether and to what extent it is a part of employees' compensation package or that he was treated differently from anyone else.[47]

---

[47] Plaintiff testified that Ms. Nelson got a flexible schedule for a master's degree but he did not

**d. Defendant's Summary Judgment Motion Relating To Plaintiff's Retaliation Claims Is Granted Because The Record Does Not Plausibly Support That Defendant Took Any Cognizable Adverse Action Against Plaintiff For Engaging In A Protected Activity**

"The antiretaliation provision [of Title VII and the ADEA prevents] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the [law's] basic guarantees." Burlington N., 548 U.S. at 63. "To establish a prima facie case of retaliation . . . [a plaintiff is] obligated to demonstrate that: (1) she was engaged in a [protected activity]; (2) her employer was aware of her participation in the protected activity; (3) the employer took adverse action against her; and (4) a causal connection existed between the protected activity and the adverse action." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 850 (2d Cir. 2013); McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001).

**i. The Record Does Not Support A Finding Of Causal Connection On Most Of Plaintiff's Retaliation Claims**

One problem with the majority of Plaintiff's retaliation claims is that the record does not plausibly support a causal connection between Plaintiff's protected activity and an allegedly retaliatory act. "[A] plaintiff making a retaliation claim under [Title VII or the ADEA] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013); see Wolf v. Time Warner, Inc., 548 F. App'x 693, 696 (2d Cir. Dec. 19, 2013) (applying the Nassar "but-for

---

know if the master's program was the same as the one for which he applied, i.e., sponsored by Defendant. Docket No. 47-1 at 44. This particular statement does not tend to establish whether the education-related flexible schedule issue is an adverse employment action. If anything, the statement is relevant to whether the record supports an inference of discrimination through disparate treatment based on national origin or age. However, it does not establish anything in that regard because the record provides no information about the national origin and age of other similar-situated employees (not just Ms. Nelson, assuming that she is similarly-situated to Plaintiff, which has not been established) working for Defendant who have been granted education-related flexible schedules.

cause" standard in the context of an ADEA retaliation claim). In <u>Zann Kwan v. Andalex Group LLC</u>, 737 F.3d 834, 845 (2d Cir. 2013), the Second Circuit held that the but-for retaliation causation standard allows a plaintiff "to demonstrate causation at the <u>prima facie</u> stage on summary judgment or at trial indirectly through temporal proximity."

A reasonable jury could not conclude from this record that Plaintiff would not have suffered the complained-of acts "but for" the fact that Plaintiff complained to Defendant for the following reasons. The following chart summarizes the dates on which Plaintiff complained about Ms. Hibbert's and Mr. Miller's harassment and discrimination and the dates on which Plaintiff suffered alleged adverse employment actions:

| Nature of Harassment or Discrimination | Date of Harassment or Discrimination | Nature of Allegedly Retaliatory Adverse Act | Date of Allegedly Retaliatory Adverse Act |
|---|---|---|---|
| The "old Haitian" insult and the excursion exclusion | September 2010 | The failure to retroactively apply the two-year-anniversary salary raise. | March 2011 |
| The telephone disputes, the family-conversation remark and the "[w]e will shoot you out of here" remark | June 15, 2011 | The issuance of the Performance Correction Notice and CMVP McGovern's promotion inquiry | July 2011 |
| Filing the EEO charge | July 2011 | The client-progress-note confusion | The record does not indicate when this occurred. |
| The second telephone dispute and the client-sister dispute | August 12, 2011 | The instruction to arrive on time | The record does not indicate when this occurred. |
| The paper-shredder dispute | October 12, 2011 | The failure to provide a flexible schedule to accommodate the pursuit of a Master's Degree | The record does not indicate when this occurred. |
| The hole-punch litter dispute | November 9, 2011 | Supervisor Momperousse's memo directing Plaintiff to update client files | March 2015 |
| Filing the instant action | January 2012 | | |

It should be noted that generally, Plaintiff does not allege and has not testified that any of the events in the third "Nature of Allegedly Retaliatory Adverse Act" column would not have occurred "but for" Plaintiff's complaint to Defendant regarding any of the alleged adverse actions in the first column. Docket Nos. 1, 31, 44. The lone exception is the client-progress-note confusion, which Plaintiff testified was "pressure" that Defendant imposed upon him due to his complaints. Docket No. 47-1 at 289-91. I again assume that Plaintiff would consider Supervisor Momperousse's March 2015 memo similar pressure. Docket No. 49. However, the record is

silent as to when the client-progress-note confusion occurred. As a result, there is no information about its temporal proximity to any of Plaintiff's protected activity that could establish a genuine issue of fact as to whether it is causally connected. See Watson v. Geithner, Nos. 09 Civ. 6624 (HBP), 10 Civ. 3948 (HBP) & 10 Civ. 7282 (HBP), 2013 WL 5420932, at *15 (S.D.N.Y. Sept. 27, 2013) ("Plaintiff has not demonstrated any temporal proximity between any of her EEO complaints and the allegedly adverse actions."). With respect to Supervisor Momperousse's March 2015 memo, it was issued roughly three years after Plaintiff's most recent protected activity—the filing of this lawsuit. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); Burkybile v. Bd. of Educ., 411 F.3d 306, 314 (2d Cir. 2005) (finding a one-year delay between protected activity and retaliation was insufficient to establish causation when the defendants had investigated the plaintiff's concerns).

Similarly, the record surrounding CM Director Wefers's instruction that all SCMs report for work on time and Defendant's alleged failure to accommodate Plaintiff's wish to study for a Master's Degree cannot support a causal connection because, like the client-progress-note confusion, the record is silent as to when those events occurred.

Next, the record does not permit a plausible conclusion that the retroactive salary raise issue would not have arisen "but for" Plaintiff's September 2010 complaint about the September 2010 remarks based on temporal proximity alone because it transpired nearly six months later and, "[i]n the Second Circuit, district courts have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation" to make a prima facie case. Hahn v. Bank of Am. Inc., No. 12 Civ. 4151 (DF), 2014 WL 1285421, at *18 (S.D.N.Y. Mar. 31, 2014) (finding that 11 weeks

between the plaintiff's complaint and her termination, "without more, . . . is too long to constitute evidence capable of sustaining [the plaintiff's] burden to establish a causal connection") (citing Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 257, 275 (S.D.N.Y. 2007), for its collection of cases).

That leaves for temporal-proximity analysis whether the Performance Correction Notice and the promotion inquiry (both July 2011) would have occurred "but for" Plaintiff's June 2011 complaint. Here, the temporal proximity of the Performance Correction Notice and the promotion inquiry—approximately three to four weeks—is sufficiently close to support a prima facie causal connection.[48]

### ii. The Record Does Not Support That Any Of The Complained Of Conduct Is An Actionable Adverse Retaliatory Act

Assuming, arguendo, that Plaintiff could establish a causal connection between his protected activity and any or all of Defendant's alleged retaliatory acts (and not just the Performance Correction Notice and the promotion inquiry), Plaintiff does not present a prima facie retaliation claim because none of the alleged acts rises to the level of actionable adverse retaliatory actions as a matter of law.

At the outset, it should be noted that the definition of a materially adverse action in the retaliation context is not coterminous with the definition in discrimination claims. Actions that are "materially adverse" for the purposes of a plaintiff's prima facie case of retaliation are those that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Hicks v. Baines, 593 F.3d 159, 162 (2d Cir. 2010) (quotation & citation omitted). This is a lower threshold than in the discrimination context.

---

[48] A jury would have evidence that the Performance Correction Notice was also issued to Ms. Hibbert and would be entitled to interpret that fact as relevant to the appropriateness of a causal-connection inference based solely upon temporal proximity.

Even with that lower threshold in mind, the record shows that the complained-of acts cannot support Plaintiff's retaliation claims because they are objectively "too trivial" to dissuade a reasonable worker from making or supporting a discrimination complaint. Hicks v. Rubin, 6 F. App'x 70, 72 (2d Cir. Mar. 20, 2001); see Wright v. Monroe Cmty. Hosp., No. 09 Civ. 6593 (MAT), 2011 WL 3236224, at *7 (W.D.N.Y. July 28, 2011), aff'd, 493 F. App'x 233 (2d Cir. 2012) (stating that "[e]mployee investigations, unwanted scrutiny from supervisors, and negative performance evaluations without attendant negative results or deprivation of position/opportunity, do not sufficiently constitute adverse employment actions" in a Title VII retaliation case); see Section III.c.ii., supra.

Because Plaintiff testified at his deposition that his retaliation claim principally rested upon Supervisor Momperousse's "pressure" on him to re-do the client progress notes, this allegation of retaliatory overwork merits specific discussion. Docket No. 47-1 at 289-91. I again assume Plaintiff would say that Supervisor Momperousse's March 2015 memo falls into this same category. Docket No. 49.

The Second Circuit has recognized that increasing an employee's workload may be an adverse action for the purposes of a retaliation claim if the increase is heavily disproportionate to those similarly situated. See Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997). Here, Plaintiff does not allege and the record does not demonstrate a disproportionate increase of Plaintiff's workload as compared to his colleagues. Plaintiff testified that management announced in 2013 that every SCM in Plaintiff's department would experience an increase in their client load. Docket No. 47-1 at 153-55. As for the client progress-note issue, Plaintiff's testimony cast it as a misunderstanding for which Supervisor Momperousse later "apologized, she said sorry." Id. at 280. In brief, Supervisor Momperousse first instructed Plaintiff to rate his clients' progress

according to the clients' self-stated goals; later, Supervisor Momperousse asked Plaintiff why he was not rating his clients' progress according to the reality of the clients' goals which would have required re-doing them; when Plaintiff reminded Supervisor Momperousse of their original conversation, Supervisor Momperousse remembered and apologized. Id. at 279-80. Taken together, Plaintiff's description of the overwork he suffered is that in the case of the progress notes, it was the result of office confusion and was immediately corrected when brought to Supervisor Momperousse's attention, and in the case of the increased client load, it was a management action imposed upon all SCMs equally such that it is devoid of any plausible retaliatory motive. See AuBuchon v. Geithner, 743 F.3d 638, 645 (8th Cir. 2014) (affirming summary judgment for the defendant on the plaintiff's Title VII retaliation claim because, inter alia, the plaintiff's evidence that the defendant accelerated his work deadlines and assigned extra work "fail[ed] to rise to the level of unlawful retaliation because they constitute 'petty slights or minor annoyances that often take place at work and that all employees experience'") (citing Burlington N., 548 U.S. at 68)); Peters v. Wal-Mart Stores East, LP, 512 F. App'x 622, 627 (7th Cir. 2013) (holding that "additional work assignments" are not, "without more, materially adverse [retaliatory] employment actions" under Title VII); Mutts v. Southern Connecticut State Univ., 242 F. App'x 725, 727 (2d Cir. June 15, 2007) (affirming the district court's dismissal of the plaintiff's retaliation claim because it was not an actionable material adverse action to assign "her an increased workload due to hiring freezes"); Edwards v. Nat'l Vision, Inc., 946 F. Supp. 2d 1153, 1175 (N.D. Ala. 2013) (holding that "[b]eing asked to perform additional work is not a materially adverse employment action" for the purposes of a Title VII retaliation claim). Delgado v. Triborough Bridge & Tunnel Auth., 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007) (finding that the retaliation plaintiff 's allegedly increased workload was not an actionable

adverse employment action when she had not pleaded any facts that demonstrated that her workload was heavily disproportionate to anyone in her department).

In sum, the record does not plausibly support Plaintiff's Title VII and ADEA retaliation claim because the only evidence of any plausible causal connection is limited to the Performance Correction Notice and the promotion inquiry. The record does not support that any of the alleged acts are actionable materially adverse retaliatory acts (the Performance Correction Notice and the promotion inquiry included) as a matter of law, such that Plaintiff's retaliation claim presents no genuine issue of material fact for a jury to decide.

## IV.    Conclusion

In light of the foregoing, I conclude that the record of this action cannot sustain prima facie Title VII or ADEA hostile work environment claims, see Sections III.b.ii.1 & III.c.i.; discrimination claims, see Sections III.b.ii.2. & III.c.ii.; and retaliation claims, see Section III.d. Plaintiff's Title VII and ADEA hostile work environment and discrimination claims fail because the record lacks evidence permitting a reasonable jury to find an inference of discrimination on the basis of national origin and age, sufficiently severe and pervasive harassment and materially adverse employment actions. Planitiff's Title VII and ADEA retaliation claims fail because the record lacks evidence permitting a reasonable jury to find an adverse employment action and, at least with respect to certain allegations, protected activity and causal connection. As a result, I **grant** Defendant's motion in its entirety, and the Clerk of the Court is ordered to enter judgment for the Defendant and close this case.

Dated:  Brooklyn, New York
           March 31, 2015

                                                  *Vera M. Scanlon*
                                                  VERA M. SCANLON
                                                  United States Magistrate Judge